# Case No. 17,846.

### The WILSON v. UNITED STATES.

[1 Brock. 423.] [1]

Circuit Court, D. Virginia.   May Term, 1820.

CUSTOMS DUTIES—SCOPE OF ACT—FOREIGN PRIVATEER—NECESSITY OF REPORT AND ENTRY—IMPORTATION OF COLOURED SEAMEN.

1. The 31 section of the act of congress passed on the 2d of March, 1799 [1 Stat. 651], "to

[1] [Reported by John W. Brockenbrough, Esq.]

regulate the collection of duties on imports and tonnage," which exempts "ships or vessels of war" from the necessity of making a report and entry, on arriving at any of the ports of the United States, from any foreign port or place, extends as well to privateers as to national ships.

2. The power of controlling navigation, is incidental to the power to regulate commerce, which the constitution confers upon congress; and, consequently, the power of congress over the vessel, is co-extensive with that over the cargo.

[Cited in U. S. v. Jackson, Case No. 15,458.]

3. The act of congress of the 28th of February, 1803 [2 Stat. 205], forbidding any master or captain of a ship or vessel, to import or bring, into any port of the United States, any negro, mulatto, or other person of colour, under certain penalties, where the admission or importation of such persons is prohibited by the laws of such state, does not apply to coloured seamen, employed in navigating such ship or vessel.

[Appeal from the district court of the United States for the district of Virginia.]

The brig Wilson, Ivory Huntress, commander, was libelled in the court below, and the vessel, with her tackle, apparel, and furniture, thirty-one demijohns of brandy, thirteen cases of gin, and several other articles, claimed as forfeited to the United States, for violating the act of congress "to regulate the collection of duties on imports and tonnage;" and also for bringing into the state of Virginia, several persons of colour, from a foreign port, contrary to the laws of the said state, and in contravention of the act of congress, entitled, "An act to prevent the importation of certain persons into certain states, where, by the laws thereof, their admission is prohibited." The four first counts of the libel, charged, that the said spirits, &c., were imported, and brought into the United States, on the —— day of October, 1819, by sea, in vessels of less capacity than ninety gallons, wine measure, from some foreign port, unknown, into the port of Norfolk, in Virginia, on board the brig Wilson, which were not mentioned in the manifest and report made by the commander of the vessel, but were carefully concealed, for the purpose of evading the payment of the duty thereon, and were discovered by an agent, specially appointed by the collector of the port of Norfolk, after diligent search, &c. The fifth count in the libel, charged, that the said brig Wilson, so arriving in the port of Norfolk, in Virginia, had on board three persons of colour, not being native citizens or registered seamen of the United States, or seamen, natives of countries beyond the Cape of Good Hope, the admission or importation of such persons being prohibited by the laws of Virginia; and that the said three persons of colour were landed from on board the said brig, contrary to the form of the act of congress, whereby the said vessel, her tackle, &c., had become forfeited to the United States.

The claimant and respondent, Huntress, in his answer to the above libel, admitted that the brig Wilson did come into the port of Norfolk, on or about the 27th day of October, 1819, having on board the brandy and gin, &c. mentioned in the libel, but affirmed that the Wilson was a private vessel of war, duly commissioned by the United Provinces of Venezuela, and New Grenada, and belonged to a citizen thereof, and that she sailed from Marguerita, on a cruize, about the 18th of August preceding, with a crew of nearly ninety persons: that in addition to the stores and other supplies, taken on board at Marguerita for the use of the crew, sundry articles of merchandise were captured on the high seas, as prize of war, and among them, the brandy and gin now libelled, which were intended to be used as sea stores of the ship, and not as merchandise. That the vessel put into the port of Norfolk, with intent to refit, and obtain supplies in the United States, without any intention, that the spirits should be unladen, or sold in the United States, and with intent that the same should be carried out again on the departure of the vessel. That on board of such armed vessels, it is not within the province of the captain, personally to inspect, or take an account of such articles, when on board; but the practice is, that such inspection and account are made and taken by some inferior officer, on whose official report of the quantity he relies. That on the arrival of the vessel at Norfolk, the first and second officer having departed, he gave orders to the clerk to examine, and report the articles on board, to enable this respondent to make his report to the collector of the port of Norfolk. That the failure of the clerk to enumerate the demijohns of brandy, and cases of gin, in the manifest, was purely accidental, resulting from the haste in which it was prepared, and the confusion on board. That these articles were not concealed, but were deposited in the usual and proper place on board the vessel, and with the other articles reported in the manifest, and delivered to the collector. In responding to the fifth count in the libel, he denied that the three persons of colour were landed from on board the Wilson, and affirmed that they were persons engaged in the navigation of a foreign armed vessel, and constituted part of her crew. He, therefore, prays restitution, &c.

The evidence on behalf of the United States, consisted in the depositions of William Bush, supernumerary inspector of the customs for the port of Norfolk; of W. P. Davis, captain of a pilot boat; of Francis Benson, commander of a revenue cutter; and of Alexander Tunstall, deputy collector for the port of Norfolk. Bush said, that he was ordered on board of the brig Wilson on the 28th of October, 1819, to see the powder discharged. After the powder was discharged, under his inspection, the vessel, which had been lying between the forts, got under weigh and went up into the harbour. On the 29th of October, Captain Huntress made

out prize tickets for his crew, a number of whom were persons of colour. The deponent examined their baggage, but found no merchandise among it. He visited the ward room, birth deck, cabin, and forecastle, and in the ward room discovered a great variety of articles, and among the rest, several demijohns of Spanish brandy, and cases of gin, which he was told were ship stores, and which were not comprised in the manifest given in on the 31st of October, by the captain. On the 1st of November, deponent went on board again, by request of the captain, and found a great part of the crew discharged that morning, of different colours and nations. whose baggage he inspected, and found no merchandise in it. While on board, Captain Benson, in the revenue boat, came along side, and assisted him in examining the vessel, and they found the same articles previously spoken of. The deposition of Benson was to the same effect. Davis stated, that about half way between Old Point Comfort and Cape Henry, he, being the commander of the pilot boat Anne of Hampton, on the 26th of October, 1819, about 10 or 11 o'clock p. m. was hailed, by some person on board of a vessel, then at anchor on the Horse Shoe, who inquired if there were any men of war in Hampton Roads, and then requested him to come on board, and take some goods, which he refused to do. The person conversing with him, said the vessel was called the brig Wilson. She was the same vessel detained by the officers of the customs, and then in dispute. Tunstall said, that on the day, or the day following that on which the search was directed of the brig Wilson, Captain Huntress made an application at the office of the customs, to make a post entry of a number of articles, stating that he had depended on his officers, and in consequence of an improper report from them, the goods were not included in the manifest. He was informed that if the proper entry was not made, from accident or mistake, it might be corrected. The captain then stated that some of the articles not entered, were taken at sea. This conversation took place after the discovery of the articles, spoken of by Bush and Benson, and about four days after the entry had been made, all of which articles were omitted in the manifest. On being interrogated what was the usual allowance per man in merchant ships, of spirits as stores, the deponent stated, that about four gallons per man were usually allowed, but that this depended somewhat on the length of the voyage, and in the case of armed cruizers, they had generally come in short of stores, and no instance of excess had occurred in practice to settle the rule in the office.

On the part of the claimant, the depositions of several of the officers of the brig Wilson, were read, all substantially proving the same facts, viz.: That about the 12th of August preceding, the privateer brig, Wilson, Ivory Huntress, commander, sailed from Marguerita, under a commission from the government of Venezuela, and proceeded to St. Thomas: that while at St. Thomas, the crew of the vessel was reinforced, by the addition of some eighteen seamen, principally people of colour, and all free. The vessel then sailed from St. Thomas, on an intended cruize of six months. At this time, the crew consisted of about eighty or ninety, inclusive, and among them were many free people of colour. During the cruize, two Spanish schooners, and one English ship, having Spanish property on board, were captured. The ship, and one of the schooners, were sent under prize masters to Marguerita, and the other schooner was abandoned, after some mutineers from the Wilson were put on board. From this schooner, they took on board of the Wilson, as prize, various articles, among them, demijohns of brandy, cases of gin, &c. The brandy and gin, and other small articles, were added to the stock of stores for the crew, and some of the gin was repeatedly afterwards served out to the crew. Several days before they reached the United States, when the Wilson was on the outer edge of the Gulf Stream, she fell in with an American schooner, called the Wasp, bound for Baltimore, and put on board of her several articles of merchandise, which were captured from the Spanish schooner, and Thomas B. Grey, of the Wilson, was sent in with the goods to Baltimore. The Wilson arrived at Norfolk, on the 27th of October, 1819, having put in to refit, with intent to depart and resume her cruize in a short time.

The district court, on the hearing of the cause, decreed, that the 31 demijohns of brandy, the 13 cases of gin, and merchandise, according to schedule, were forfeited to the United States, under the 29th and 68th sections of the act of congress, entitled, "An act to regulate the collection of duties on imports and tonnage." "And it appearing to the court, that three persons of colour, as charged in the libel, were brought in, and landed from the said brig Wilson, not being native citizens, or registered seamen of the United States, or seamen, natives of countries beyond the Cape of Good Hope, in violation of the act of congress of the United States, entitled, 'An act to prevent the importation of certain persons into certain states, where, by the laws thereof, their admission is prohibited;' whereby the said brig Wilson, together with her guns, stores, tackle, apparel, and furniture, have become forfeited to the United States, and they are decreed to be forfeited accordingly." [Case unreported.] From this decree, the claimant appealed to this court.

MARSHALL, Circuit Justice. The four first counts of this case, present for the consideration of the court, a general question of considerable importance. It is this: Does

the act "to regulate the collection of duties on imports and tonnage"[2] apply to privateers, not engaged in the importation of goods? The 31st section enacts "that it shall not be necessary for the master, or person having the command of any ship or vessel of war, &c., to make such report and entry as aforesaid." If the words "ship or vessel of war," be construed to comprehend a privateer, there is an end of this part of the case, because, if no report or entry is required, it cannot be pretended, that any of the provisions of the act extend to a privateer, demeaning herself in her military character, and not performing the office of a merchant vessel.

The counsel for the appellant has certainly urged many reasons, which have great weight in favour of the construction for which he contends. The term, "ship or vessel of war," has been considered, and, I think, properly considered, as a generic term, including both national ships, and private armed ships. When it is used generally, it comprehends both, unless the context, or the subject matter, should exclude the one or the other. The authorities cited at bar, show, that courts and writers on public law, have used the term in this general sense. If either the language, or the objects of this law, be consulted, I think they strengthen this natural and comprehensive construction of these words. The object of the law, is professedly and obviously to raise a revenue from commerce and consumption, not to regulate the conduct of the ships of war, whether public or private, of foreign nations. All the regulations are obviously calculated for merchant vessels, and not one calculated for privateers, who might come into our ports, although a totally distinct provision for them, would certainly be necessary. The language of the law, applies it to vessels destined for the United States, not to vessels destined for a cruize on the high seas. The form of the manifest requires, that the importer should state, to what port the vessel is bound, and to whom the goods are consigned; regulations not adapted to goods captured at sea, by a cruizer. If this act applies to privateers, the tonnage duty would be demandable. But it cannot be supposed, that this duty is imposed on privateers, employed in cruizing, and not in the conveyance of merchandise.

It is also an argument, which deserves consideration, that the policy of the United States has been unfriendly to the sale, in our ports, of prizes made by foreign privateers, on nations with whom we are at peace. Some of our treaties contain express stipulations against it; and the course of the government has been, to prohibit the practice, even where no specific engagements bind us to do so. Were the revenue laws, applicable to privateers, and to their prizes and prize goods, they would give a right to introduce those goods in opposition to the avowed and uniform policy of the government. The doctrine, that the validity of prizes could not be adjudged in our ports, would be of little importance, if they could be brought in and sold.

I think, then, that our revenue laws do not apply to privateers, unless they take up the character of merchant-men, by attempting to import goods. When they do so, they attempt, under the garb of their military character, to conceal real commercial transactions. This would be fraud on the revenue laws, which no nation will or ought to tolerate. The privateer, which acts as a merchant vessel, must be treated and considered as a merchant vessel. In this case, there is no evidence, that any goods were landed, or that more were brought in, than were intended to be carried out. The only evidence, which I think at all important, is that of the pilot. His testimony, certainly, excited suspicion. Opposed to it, however, is the testimony of the witnesses belonging to the vessel, who say, that the spirits were designed for the crew, to be used as stores.

I proceed, now, to the fifth count in the libel. The first question which will be considered in this part of the case, will be the constitutionality of the act of congress, under which this condemnation has been made. It will readily be admitted, that the power of the legislature of the Union, on this subject, is derived entirely from the 3d clause of the 8th section of the 1st article of the constitution. That clause enables congress, "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes." What is the extent of this power to regulate commerce? Does it not comprehend the navigation of the country? May not the vessels, as well as the articles they bring, be regulated? Upon what principle is it, that the ships of any foreign nation have been forbidden, under pain of forfeiture, to enter our ports? The authority to make such laws has never been questioned; and yet, it can be sustained by no other clause in the constitution, than that which enables congress to regulate commerce. If this power over vessels is not in congress, where does it reside? Certainly it is not annihilated; and if not, it must reside somewhere. Does it reside in the states? No American politician has ever been so extravagant as to contend for this. No man has been wild enough to maintain, that, although the power to regulate commerce, gives congress an unlimited power over the

---

[2] "And be it further enacted, that it shall not be necessary for the master, or the person having the charge, or command, of any ship or vessel of war, or of any ship or vessel, employed by any prince, or state, as a public packet, for the conveyance of letters and despatches, and not permitted, by the laws of such prince, or state, to be employed in the transportation of goods, wares, or merchandise, in the way of trade, to make such report and entry, as aforesaid." Act March 2, 1799, c. 128, § 31; 1 Story's Laws, 600.

cargoes, it does not enable that body to control the vehicle in which they are imported; that, while the whole power of commerce is vested in congress, the state legislatures may confiscate every vessel which enters their ports, and congress is unable to prevent their entry. Let it be admitted, for the sake of argument, that a law, forbidding a free man of any colour, to come into the United States, would be void, and that no penalty, imposed on him by congress, could be enforced; still, the vessel, which should bring him into the United States, might be forfeited, and that forfeiture enforced; since even an empty vessel, or a packet, employed solely in the conveyance of passengers and letters, may be regulated and forfeited. There is not, in the constitution, one syllable on the subject of navigation. And yet, every power that pertains to navigation has been uniformly exercised, and, in the opinion of all, been rightfully exercised, by congress. From the adoption of the constitution, till this time, the universal sense of America has been, that the word "commerce," as used in that instrument, is to be considered a generic term, comprehending navigation, or, that a control over navigation is necessarily incidental to the power to regulate commerce. I could feel no difficulty in saying, that the power to regulate commerce clearly comprehended the case, were there no other clauses in the constitution, showing the sense of the convention on that subject. But there is a clause which would remove the doubt, if any could exist.

The first clause of the ninth section, declares, that "the migration or importation of such persons as any of the states, now existing, shall think proper to admit, shall not be prohibited by the congress, prior to the year 1808." This has been truly said to be a limitation of the power of congress to regulate commerce, and it will not be pretended, that a limitation of a power is to be construed into a grant of power. But, though such a limitation be not a grant, it is certainly evidence of the extent which those who made both the grant and limitation, attributed to the grant. The framers of our constitution could never have declared, that a given power should not, for a limited time, be exercised on a particular object, if, in their opinion, it could never be exercised on that object. Suppose the grant and the limitation be brought together, the clause would read thus: "Congress shall have power to regulate commerce, &c., but this power shall not be so exercised, as to prohibit the migration, or importation of such persons, as any of the states now existing, may think proper to admit, prior to the year 1808." Would it be possible to doubt, that the power to regulate commerce, in the sense in which those words were used in the constitution, included the power to prohibit the migration, or importation, of any persons whatever, into the states, except so far as

this power might be restrained by other clauses of the constitution? I think it would be impossible. It appears to me, then, that the power of congress over vessels, which might bring in persons of any description, whatever, was complete before the year 1808, except that it could not be so exercised, as to prohibit the importation or migration of any persons, whom any state, in existence at the formation of the constitution, might think proper to admit. The act of congress, then, is to be construed with a view to this restriction, on the power of the legislature; and the only question will be, whether it comprehends this case? The case is that the brig Wilson, a private armed cruizer, commissioned by the government of Buenos Ayres, came into Norfolk, navigated by a crew some of whom were people of colour. They were however, all free men, and all of them sailors, composing a part of the crew. While in port, some of them were discharged, and came on shore. The libel charges that three persons of colour were landed from the vessel, whose admission or importation was prohibited by the laws of Virginia, contrary to the act of congress, by which the vessel was forfeited. Is this case within the act of congress, passed the 28th of February 1803?[3]

---

[3] An act to prevent the importation of certain persons into certain states, where, by the laws thereof, their admission is prohibited.

Section 1. Be it enacted, that from and after the first of April next, no master or captain of any ship or vessel, or any other person, shall import or bring, or cause to be imported or brought, any negro, mulatto, or other person of colour, not being a native, a citizen, or registered seaman, of the United States, or seamen, natives of countries beyond the Cape of Good Hope, into any port or place of the United States, which port or place shall be situated in any state, which, by law, has prohibited, or shall prohibit, the admission, or importation of such negro, mulatto, or other person of colour. And if any captain, or master aforesaid, or any other person, shall import or bring, or cause to be imported or brought, into any of the ports or places aforesaid, any of the persons whose admission or importation, is prohibited, as aforesaid, he shall forfeit and pay the sum of one thousand dollars for each, and every negro, mulatto, or other person of colour aforesaid, brought or imported as aforesaid; to be sued for and recovered by action of debt, in any court of the United States; one half thereof to the use of the United States, the other half, to any person or persons prosecuting for the penalty: and in any action instituted for the recovery of the penalty aforesaid, the person or persons sued, may be held to special bail: provided always, that nothing contained in this act, shall be construed to prohibit the admission of Indians.

Sec. 2. And be it further enacted, that no ship or vessel, arriving in any of the said ports or places of the United States, and having on board any negro, mulatto or other person of colour, not being a native, a citizen, or registered seaman of the United States, or seamen, natives of countries beyond the Cape of Good Hope, as aforesaid, shall be admitted to an entry. And if any such negro, mulatto, or other person of colour, shall be landed from on board any ship, or vessel, in any of the ports or places aforesaid, or on the coast of any state prohibiting the admission or importation as aforesaid, the said ship or vessel, together with her tackle, apparel, and furniture,

The first section, which is the prohibiting part of the act, is in these words: "From and after the first day of April next, no master or captain of any ship or vessel, or any other persons, shall import or bring, or cause to be imported or brought, any negro, mulatto, or any person of colour, &c." There are nice shades or gradations in language, which are more readily perceived than described, and the mind impressed with a particular idea, readily employs those words which express it most appropriately. Words which have a direct and common meaning, may also be used in a less common sense, but we do not understand them in the less common sense, unless the context, or the clear design of the person using them, requires them to be so understood. Now the verbs, "to import," or "to bring in," seem to me to indicate, and are most commonly employed as indicating, the action of a person on any thing, animate or inanimate, which is itself passive. The agent, or those who are concerned in the agency or importation, are not, in common language, said to be imported or brought in. It is true that a vessel coming into port, is the vehicle which brings in her crew, but we do not in common language say, that the mariners are "imported," or brought in by a particular vessel; we rather say they bring in the vessel. So, too, if the legislature intended to punish the captain of a vessel, for employing seamen of a particular description, or for allowing these seamen to come on shore, we should expect that this intention would be expressed by more appropriate words, than "to import" or "bring in." These words are peculiarly applicable to persons not concerned in navigating the vessel. It is not probable, then, that in making this provision, a regulation respecting the crew of a vessel was in the mind of congress. But it is contended, on the part of the prosecution, that the succeeding words of the sentence, exempting certain descriptions of persons from the general prohibition, show that the prohibition itself was intended to comprehend the crew, as well as those who did not belong to the vessel. Those words are, "not being a native, a citizen, or registered seaman of the United States, or seamen natives

shall be forfeited to the United States, and one half of the net proceeds of the sales on such forfeiture shall inure, and be paid over, to such person or persons, on whose information the seizure on such forfeiture shall be made.

Sec. 3. And be it further enacted, that it shall be the duty of the collectors, and other officers of the customs, and all other officers of the revenue of the United States, in the several ports or places situated as aforesaid, to notice, and be governed by, the provisions of the laws now existing, in the several states, prohibiting the admission or importation of any negro, mulatto, or other person of colour, as aforesaid. And they are hereby enjoined vigilantly to carry into effect the said laws of said states, conformably to the provisions of this act; any law of the United States to the contrary notwithstanding. Act Feb. 28, 1803, c. 63.

of countries beyond the Cape of Good Hope." That this limitation, proves the prohibition to have been intended to comprehend freemen, as well as slaves, must, I think, be admitted. But it does not follow, that it was, also, intended to comprehend the crew of a vessel, actually employed in her navigation, and not put on board, in fraud of the law. A person of colour, who is a registered seaman of the United States, may be imported, or brought into the United States, in a vessel in which he is not employed as a mariner. The construction, therefore, which would extend the prohibitory part of the sentence, to the crew of the vessel, in consequence of the language of the exception, is not a necessary construction, though I must admit, that it derives much strength from that language. The forfeiture of the vessel is not, in this section of the act, but I have noticed its construction, because it is not reasonable to suppose, that it was intended to forfeit a vessel for an act, which was not prohibited. The second section enacts, "that no ship or vessel, arriving in any of the said ports or places of the United States, and having on board any negro, mulatto, or other person of colour, not being a native, a citizen, or registered seaman of the United States; or seamen, natives of countries beyond the Cape of Good Hope, as aforesaid, shall be admitted to an entry." It is obvious, that this clause was intended to refuse an entry to every vessel, which had violated the prohibition contained in the first section; and that the words, "having on board" were used, as co-extensive with the words "import," or "bring." We had, at that time, a treaty with the emperor of Morocco, and with several other Barbary powers. Their subjects are all people of colour. It is true, they are not so engaged in commerce, as to send ships abroad. But the arrival of a Moorish vessel in our ports, is not an impossibility; and can it be believed, that this law was intended to refuse an entry to such a vessel? It may be said, that an occurrence which has never taken place, and which, in all probability, never will take place, was not in the mind of congress; and, consequently, the omission to provide for it, ought not to influence the construction of their acts. But there are many nations, with whom we have regular commerce, who employ coloured seamen. Could it be intended by congress, to refuse an entry to a French, a Spanish, an English, or a Portuguese merchant vessel, in whose crew there was a man of colour? I think this construction could never be given to the act. The words, "having on board a negro, mulatto, or other person of colour," would not, I think, be applied to a vessel, one of whose crew, was a person of colour.

The section then proceeds: "And if any such negro, &c., shall be landed from on board any ship or vessel, &c., the said ship or vessel, &c., shall be forfeited." The words, "shall be landed," seem peculiarly applicable

to a person, or thing, which is imported, or brought in, and which is landed, not by its own act, but by the authority of the importer, not to a mariner, going on shore voluntarily, or on the business of the ship. The words, "such negro," &c., refer to the preceding passages, describing those whom a captain of a vessel is forbidden to import, and whose being on board a vessel exclude such vessel from an entry, and no others. If, then, the commentary, which has been made on those passages, is correct, the forfeiture is not incurred by a person of colour, coming in as part of a ship's crew, and going on shore.

Although the powers of Barbary, do not send merchant ships across the Atlantic, yet their treaties with us, contemplate the possibility of their cruizers entering our ports. Would the cruizer be forfeited, should one of the crew come on shore?

I have contended, that the power of congress to regulate commerce, comprehends, necessarily, a power over navigation, and warrants every act of national sovereignty, which any other sovereign nation may exercise over vessels, foreign or domestic, which enter our ports. But there is a portion of this power, so far as respects foreign vessels, which it is unusual for any nation to exercise, and the exercise of which would be deemed an unfriendly interference with the just rights of foreign powers. An example of this would be, an attempt to regulate the manner in which a foreign vessel should be navigated in order to be admitted into our ports; and to subject such vessel to forfeiture, if not so navigated. I will not say, that this is beyond the power of a government, but I will say, that no act ought to have this effect given to it, unless the words be such as to admit of no other rational construction.

I will now take some notice of that part of the act which has a reference to the state law. The language, both of the constitution and of the act of congress, shows, that the forfeiture was not intended to be inflicted in any case but where the state law was violated. In addition to the words, in the first and second sections of the act, which confine its operation to importations, into "a state which, by law, has prohibited, or shall prohibit, the importation of such negro," &c.; the third section enjoins it on the officers of the United States, in the states having laws containing such prohibition, "to notice and be governed by the provisions of the laws, now existing, of the several states, prohibiting the admission or importation of any negro, mulatto, or any person of colour, as aforesaid." This is not inflicting a penalty for the violation of a state law, but is limiting the operation of the penal law of the United States, by a temporary demarcation given in the constitution. The power of congress to prevent migration or importation, was not to be exercised prior to the year 1808, on any person whom any of the states might think proper to admit. All

were admissible who were not prohibited. It was proper, therefore, that the act of congress should make the prohibitory act of the state, the limit of its own operation. The act of congress does not, necessarily, extend to every object comprehended in the state law, but neither its terms, nor the constitution, will permit it to be extended farther than the state law.

The first section of the act "to prevent the migration of free negroes and mulattoes" (see 1 Rev. Code Va. 1819, pp. 437, 438, c. 91, §§ 64-66) into this commonwealth, prohibits their coming voluntarily or being imported. The second section imposes a penalty on any master of a vessel, who shall bring any free negro or mulatto. The third section provides, that "the act shall not extend to any masters of vessels, who shall bring into this state any free negro or mulatto, employed on board, and belonging to such vessel, and who shall therewith depart." The act, then, does not prohibit the master of a vessel, navigated by free negroes or mulattoes, from coming into port, and setting only part of his crew on shore, provided they depart with the vessel. The state prohibition, then, does not commence, until the vessel departs without the negro or mulatto seaman. No probability, however strong, that the vessel will depart without the seaman, can extend the act to such a case, until the vessel has actually departed. If this be true, neither does the act of congress extend to such a case. But this is not all. The act of assembly prohibits the admission of free negroes and mulattos only, not of other persons of colour. Other persons of colour were admissible into Virginia. The act of congress makes a clear distinction between free negroes, and mulattos, and other persons of colour. But so much of the act of congress, as respects other persons of colour, does not apply to Virginia, because such persons were admissible into this state. The libel charges the sailors landed, to have been persons of colour, not negroes or mulattos. If, under this libel it were allowable to prove, that the sailors landed, were, in fact, negroes or mulattos, it is not proved. Mr. Bush does not prove, that any were landed, but says, that those discharged were "of different colours and nations." Andrew Johnson says "that on the 29th of October, the people of colour received their prize tickets, went on shore, and, of course, took their own discharge." There is, then, no evidence, that these people were negroes or mulattos. Upon these grounds, I am of opinion, that no forfeiture of the vessel has been incurred, and that so much of the sentence as condemns the brig Wilson, ought to be reversed, and restitution awarded.

———

WILSON (UNITED STATES v.). See Cases Nos. 16,729-16,737.

WILSON (WASHINGTON v.). See Case No. 17,240.