## OSAKA SHOSEN KAISHA LINE *v.* UNITED STATES.

No. 224.   Argued January 4, 1937.—Decided February 1, 1937.

Mr. *Robert Eikel, Jr.,* with whom Mr. *J. Newton Ray-zor* was on the brief, for petitioner.

Mr. *Charles E. Wyzanski, Jr.,* with whom Solicitor General *Reed,* Assistant Attorney General *McMahon,* and Messrs. *William W. Barron, Albert E. Reitzel,* and *Edward J. Garrahan* were on the brief, for the United States.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

Section 10 (a) of the Immigration Act of February 5, 1917, as amended, Title 8 U. S. C. § 146, makes it the duty of every person, including owners, masters, officers, and agents of vessels or transportation lines, "bringing an alien to, or providing a means for an alien to come to, the United States, to prevent the landing of such alien in the United States at any time or place other than as designated by the immigration officers." Failure to comply with the provision constitutes a misdemeanor punishable by fine or imprisonment or both. If the Secretary of Labor is of opinion that a prosecution is impracticable or inconvenient, a penalty of $1,000 is imposed and a lien upon the vessel is created for which such vessel shall be libeled in the appropriate United States court.

By subdivision (b) of § 10, proof that the alien failed to present himself at the time and place designated by the immigration officers constitutes *prima facie* evidence that the alien has landed at a time or place other than that designated.

On June 11, 1932, the Santos Maru came into the port of New Orleans with Salvatore Sprovieri, an alien passenger, on board. The passenger was en route from Brazil to Japan upon a through ticket; and was not entitled to enter the United States. On arrival of the steamship, the immigration officers at New Orleans issued a written order to the steamship to hold the alien

on board at all ports of the United States at which the ship might touch—the order being duly served upon the officers of the ship. A few days later, the ship arrived at the port of Galveston, Texas; and there, by the negligence of the ship, its officers and crew, the alien passenger was allowed to escape and land in the United States without permission of the immigration officers and in violation of their order. Officers of the ship notified the immigration authorities of the escape of the passenger; but the ship sailed before his arrest. Subsequently, the passenger was arrested and deported on another vessel of the same line.

The Secretary of Labor was of opinion that it was impracticable and inconvenient to prosecute the matter criminally; and a libel was filed on behalf of the United States in the appropriate federal district court, praying a decree for the $1,000 penalty and to enforce the lien therefor against the ship.

The district court took the view that, the alien passenger not being bound for the United States but en route from Brazil to Japan, the ship was not liable, and dismissed the libel with prejudice. The circuit court of appeals held otherwise, reversed the decree and remanded the cause with instructions to enter a decree for the United States. 84 F. (2d) 482.

The basic contention of petitioner, in its assault upon the latter decree, is that one who transports an alien passenger from one foreign country to another, does not bring him to the United States, within the meaning of § 10, by entering, with the alien on board, an American port of call on the way. If it were not for a sentence contained in the opinion of this court in *Taylor* v. *United States, infra,* of which we shall speak later, we might dispose of this contention by simply saying that it is contrary to the unambiguous terms of the section. Nothing can be plainer than that a ship which enters

one of our ports has come to the United States; and a passenger on board obviously has come with the ship, and consequently has been brought by the ship to the United States. And this remains none the less the fact, although the ship continue on her way to a foreign port, and although it was intended that the passenger should go with her, and not be left in the United States. To say that the passenger has not been brought to the United States unless the intent was to leave him here, is not to construe the statute but to add an additional and qualifying term to its provisions. This we are not at liberty to do under the guise of construction, because, as this court has so often held, where the words are plain there is no room for construction. *United States* v. *Wiltberger,* 5 Wheat. 76, 95–96; *Hamilton* v. *Rathbone,* 175 U. S. 414, 419, 421; *United States* v. *Hartwell,* 6 Wall. 385, 396; *Crooks* v. *Harrelson,* 282 U. S. 55, 59–60.

It is urged that the statute is highly penal in character and should therefore be construed strictly. But the object of all construction, whether of penal or other statutes, is to ascertain the legislative intent; and in penal statutes, as in those of a different character, "if the language be clear, it is conclusive." *United States* v. *Hartwell, supra,* pp. 395–396; *United States* v. *Corbett,* 215 U. S. 233, 242; *Sacramento Navigation Co.* v. *Salz,* 273 U. S. 326, 329–330.

The duty of the ship is to prevent the landing of through alien passengers except by permission. The United States is under no obligation to permit the temporary landing of such passengers at its ports at all. A detention order is not necessary, although one was issued in this instance; for the case is not one where landing is permitted if not forbidden by the immigration officials, but where it is forbidden unless permitted. Section 10 is not like, for example, § 20 of the Immigration Act of 1924, which imposes a fine upon the owner, charterer,

agent, consignee, or master of a vessel arriving in the United States who fails, after inspection, to detain an alien seaman employed on the vessel "if required" by the immigration officer in charge of the port to do so. Under that provision, "A duty so to detain does not arise unless and until such detention is required by the immigration officer." *Compagnie Generale* v. *Elting*, 298 U. S. 217, 223. Under § 10, however, the duty is imposed by the statute and not by requirement of the immigration officials. The matter is taken care of by a regulation of the Secretary of Labor (Rule 3, subdivision H, ¶ 6, "Immigration Laws and Rules of January 1, 1930," p. 125), which provides that through alien passengers "may land temporarily without visaed passports, for the limited period of time during which the vessel lies over in port, in cases where the examining officer is satisfied that they will depart on the vessel at the time it proceeds on the same voyage . . ."

The main reliance of petitioner is on *Taylor* v. *United States*, 207 U. S. 120, 124, 125. That case arose under § 18 of the Immigration Act of March 3, 1903, which imposes the duty upon a ship bringing an alien to the United States to adopt due precautions to prevent the landing of such alien at any time or place other than that designated by the immigration officers. This court held that the provision did not apply "to the ordinary case of a sailor deserting while on shore leave." In the course of the opinion it was said that the phrase "bringing an alien to the United States" meant "transporting with intent to leave in the United States and for the sake of transport—not transporting with intent to carry back, and merely as incident to employment on the instrument of transport." "Intent to leave" is right enough as applied to a seaman on the ship, but it may not be extended to include an alien through passenger.

The court there was dealing with and thinking of a sailor, and not of an alien through passenger; and its

language must be read accordingly, for—"It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision." *Cohens* v. *Virginia,* 6 Wheat. 264, 399; *Humphrey's Executor* v. *United States,* 295 U. S. 602, 626–627. The point to be observed in the *Taylor* case is that the transportation of the sailor was merely as an "incident to employment on the instrument of transport." That is to say, the sailor was one of the agencies which brought the ship in, rather than an alien brought in by the ship. "It is true," Chief Justice Marshall said in *The Wilson* v. *United States,* 1 Brock. 423, 30 Fed. Cas. 239, 244, "that a vessel coming into port, is the vehicle which brings in her crew, but we do not in common language say, that the mariners are 'imported,' or brought in by a particular vessel; we rather say they bring in the vessel." The generality of the affirmative phrase, "transporting with intent to leave in the United States," is obviously qualified by the negative form of expression immediately following, "not transporting with intent to carry back and *merely as incident to employment on the instrument of transport."* (Italics supplied.)

When we consider the relation of the sailor to the ship—that he is, for all practical purposes, a part of it and not, like a passenger, apart from it—it is quite apparent that the word "alien" as used in § 10 does not, and was not intended to, include an alien sailor. Some of those engaged in the operation of a vessel must go ashore. They may be required to load and unload the cargo, to communicate with the local representatives of the line, and necessarily to perform a variety of duties which require their presence ashore. A denial of the privi-

lege would be so likely to adversely affect commerce as to require much plainer language than we find in § 10 to justify the conclusion that Congress had denied it. To adopt that conclusion would be to declare that the act was violated whenever a member of the crew was sent ashore to perform an act imperatively necessary in the service of the ship.

Petitioner cites, also in support of its contention, *The Alfonso XIII,* 53 F. (2d) 124, 126; *Dollar S. S. Line* v. *Elting,* 51 F. (2d) 1035; and *The Habana,* 63 F. (2d) 812; but those decisions were expressly based upon what was regarded as the controlling effect of the phrase which we have quoted from the *Taylor* case; and from a reading of the opinions it seems quite evident that but for that the decisions would have been otherwise. For example, Judge Woolsey, in *The Alfonso XIII,* said that if he were dealing with the matter *de novo,* uninstructed by judicial authority above him, he would have found it difficult to give the words "bringing an alien to the United States" a meaning different from what they literally mean.

We reject the notion that in the case with which we are now concerned it is necessary to constitute the act of bringing an alien to the United States that there should be an intent to leave him here.

We see nothing in the suggestion that subdivision (b) of § 10 sustains petitioner's view of the case. That subdivision simply provides a rule of evidence affecting the burden of proof, and we think does not in any way restrict the plain meaning of § 10 (a) as we have found it.

*Decree affirmed.*