(C. D. 699)

OTIS MCALLISTER & CO. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided October 30, 1942)

*Lawrence & Tuttle* (*George R. Tuttle* and *Charles F. Lawrence* of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Frank X. O'Donnell, Jr.*, special attorney), for the defendant.
*Lamb & Lerch* (*David A. Golden* of counsel) as *amici curiae*.

Before TILSON, KINCHELOE, and DALLINGER, Judges

DALLINGER, Judge: This is a suit against the United States, arising at the port of San Francisco, brought to recover certain customs duties alleged to have been improperly exacted on a particular importation of wire netting. Duty was levied thereon at the rate of 60 per centum ad valorem under paragraph 397 of the Tariff Act of 1930, as modified by Presidential proclamation promulgated under section 336 of said act and published in T. D. 44605, which proclamation increased the rate of duty on woven wire fencing and woven wire netting from 45 to 60 per centum ad valorem.

It is claimed that this imported wire netting is not woven and therefore is not within the scope of said Presidential proclamation, but is dutiable at but 45 per centum ad valorem under said paragraph 397 as a manufacture of metal not specially provided for.

At the first hearing, held at Seattle on November 10, 1941, the plaintiff offered in evidence the testimony of Paul J. Giese, an importer of steel products, including hexagonal wire netting from Germany, since 1926. He described the process of manufacturing such wire netting in Germany during the years 1928, 1936, and 1938. In connection with his testimony, a certain blueprint and a photograph were marked illustrative exhibits A and B for identification.

According to this witness' testimony, in the manufacture of the wire netting described by him there is only one set of wires used, namely, single vertical strands coming up from the bottom of the producing machine.

On cross-examination the witness testified that this kind of netting might be called "lock-twist" netting; and that there is another kind of wire netting that is actually woven in the same way as cloth, having both warp and weft wires, the weft crossing the warp by means of a shuttle.

At the second hearing, held at San Francisco on November 26, 1941, the plaintiff offered in evidence the testimony of Raymond W. Nolan, a clerk in the office of the appraiser of merchandise at San Francisco, who testified that the wire netting covered by the testimony of the witness Giese in Seattle was not similar to that involved in the instant case, a sample of which was admitted in evidence as plaintiff's exhibit 1. At the conclusion of this witness' testimony, on motion of counsel for the Government the testimony of the witness Giese was stricken from the record.

The plaintiff then offered in evidence the testimony of Ralph A. Bonnett, associated with the firm of Otis, McAllister & Co. of San Francisco, who testified in part as follows:

Q. If you will assume please that the merchandise which Otis, McAllister & Co., imported, and which is covered by this Protest No. 996995–G, was when imported, in the same form as Exhibit 1, will you state whether in your opinion such merchandise, that is foreign goods must have been made by the same process as Exhibit 1?—A. I would say it was.

Q. Will you then please describe to the best of your ability this process which you have referred to that you observed at the California Wire Cloth Corporation, in Oakland?—A. The process consists of the assembly of a number of parallel wires in a machine, and every alternate wire being in the form of a long coil in a tube, and as the wires progress through the machine these alternating coils in the tubes revolve around stationary wire that is going along side of it, thus forming the loops on the stationary wires and the interlacing.

Q. Referring to Exhibit 1, can you observe that some of the wires are as you have stated been wrapped or possibly twisted around other wires?—A. Yes.

\*　　\*　　\*　　\*　　\*　　\*　　\*

Q. When this product was being made, did you observe whether or not any wires or wire material was moving or placed at right angles to any other wire?—A. I believe the whole process is merely an interweaving of these parallel wires as they run through the machine.

Q. Except for that interweaving, are the wires run in the same direction?—A. Yes.

The Government then offered in evidence the testimony of six witnesses. The first, John S. Hawley, superintendent of the California Wire Cloth Corporation of Oakland, Calif., since August 1939, testified that his company manufactured wire netting similar

to that represented by exhibit 1, in various sizes. He then testified in part as follows:

Q. * * * You say there are two sets of wires?—A. Yes.

Q. Do they have in your plant specific names?—A. Yes.

Mr. TUTTLE. I object to that as immaterial, whether wires have any specific names.

Judge DALLINGER. Objection overruled.

Mr. TUTTLE. Exception.

By Mr. O'DONNELL:

Q. Would you mind giving the names of these two sets of wires that are used in the manufacture of an article such as Exhibit 1, in this case?—A. Those are known at our plant as warp and filling wires.

* * * * * * *

Judge DALLINGER. Do you consider all of the various kinds of wire netting you make, as woven wire netting?

The WITNESS. Yes.

Judge DALLINGER. No matter how they are made?

The WITNESS. All netting is considered as woven wire netting.

Judge DALLINGER. In other words, all wire netting in your opinion is woven wire netting?

The WITNESS. Yes.

By Mr. O'DONNELL:

Q. On what type of machines is merchandise like Exhibit 1, made?—A. On a netting loom.

Q. Would you mind describing the manufacture of merchandise like Exhibit 1, referring to the two sets of wires by name, and the various parts of the machine by name, as you go along?—A. Approximately 50 per cent of the wires are fed in either from spools or from a coil of wire, the coil being in a bundle. These wires are fed underneath the roller at the base of the machine and are stationary. They cannot be twisted without becoming untwisted, in as much as they are fastened both at the top and bottom. They are fastened by going through at the bottom and going into the cloth at the top. Approximately 50 per cent of the wires are formed on a bobbin coiling machine. Long coils are inserted in the top. They are loose, and can be moved. Those are the filling wires, and they can be moved back and forth between what we call the warp wires, and as they are moved from one wire to the other they twist as they cross each wire. That makes a twist motion. After that twist has been made it is pulled up over a peg roller and wound into the package and taken off the machine.

Two photographs of the machine described by the witness were then admitted in evidence as defendant's illustrative exhibits A and B.

The witness then marked with a roman numeral "I" the place where the spools containing the wire appear in illustrative exhibit A; the wire after it leaves said spools with a roman numeral "II"; and the so-called bobbins with a roman numeral "III." He then marked with a roman numeral "III" on illustrative exhibit B the place where appear the bobbins; he marked the so-called warp wires with a roman numeral "II"; and the so-called filling wires with a roman numeral "IV." He then proceeded to testify in part as follows:

Q. Will you, limiting your answer to your experience with the California Wire Cloth Corporation, tell us whether Exhibit 1, in your opinion, is woven?—A. Yes.

Q. Basing your answer on your five years experience with the California Cotton Mills, were you able to arrive at an understanding of the term "woven"?—A. Yes.

Q. Can you give us your description of the term "woven"?

\*     \*     \*    ·    \*     \*     \*     \*

The WITNESS. In my opinion, weaving is a process of interlacing or' twisting two weaves of thread to form cloth.

At this juncture, a tag, such as the one that is usually affixed to a roll of netting manufactured by the plaintiff's company was admitted in evidence as defendant's illustrative exhibit C. This tag reads "CALWICO POULTRY NETTING." Also, a certain standard specification sheet showing the size and kind of wire which goes into the manufacture of each kind of product made by the witness' company was then admitted in evidence as defendant's illustrative exhibit D.

On cross-examination the witness testified in part as follows:

X Q. You stated that Exhibit 1 is a fabric formed by interlacing and twisting. Which of those two processes is the interlacing?—A. It is the movement of the filling wires back and forth in between the adjoining warp wires.

X Q. By that movement back and forth, I don't believe you intend to convey the idea that the warp wires move crosswise in the fabric for the entire width of it?—A. No, not for the entire width.

\*     \*     \*     \*     \*     \*     \*

X Q. In forming this article as we see it before us here, the filling is twisted around the selvedge, is that right?—A. That is right.

X Q. And this wire returns where? It is twisted around which wire?—A. The warp wire.

X Q. Where does the filling wire go to?—A. Back to the selvedge.

X Q. Is that true throughout the whole fabric, that the filling goes back to the selvedge from the center of the article?—A. That is right.

Judge DALLINGER. Do you know of any textile fabric in your five years experience in the cotton mills that you have referred to, that followed that same process you have just described?

The WITNESS. Not exactly. I do know of one process which has more of a circular motion though. It doesn't go back and forth; it runs circular.

\*     \*     \*     \*     \*     \*     ●

X Q. You gave us your opinion of the meaning of the word "weaving". Would you please repeat that?—A. Weaving is the interlacing or twisting of two series of threads to form a cloth.

X Q. Do you know of any exception or rather do you know of any article which is made without there being a warp and weft thread, or filling, whatever you care to call it, where one goes in an opposite direction to the other?—A. Not that I have ever manufactured or supervised the manufacture of.

The Government's second witness, S. C. Pohlman, general manager of the California Wire Cloth Corporation, testified that in the manufacture of articles like exhibit 1 three sets of wires are used and are

recognized as warp wires, filling wires, and selvedge wires, respectively, and that during all the time he has been with the company merchandise like exhibit 1 was described as woven wire netting.

On cross-examination he testified that all wire netting manufactured by his company was known as woven wire netting, except netting known as lock-twist, a sample of which was admitted in evidence as illustrative exhibit E. Interrogated with reference to said exhibit the witness testified in part as follows:

X Q. Has that both a warp wire, and what has been referred to here as a weft wire?—A. No, only warp wires.

X Q. Does it have a selvedge, what you call a selvedge?—A. It could or could not.

\* \* \* \* \* \* \*

X Q. You are also familiar with the fact that you do make wire cloth, where the fabric is formed by warp and weft wires interlacing, one wire running in an opposite direction to the other?—A. Yes.

X Q. Do you call that material woven wire netting?—A. Yes, we would.

X Q. Do you have any limited meaning of the term "woven wire cloth"?—A. No.

\* \* \* \* \* \* \*

X Q. Why do you say that one article is woven wire cloth and Exhibit 1, is not? —A. Because Exhibit 1 is woven wire netting.

X Q. But you also do make a material you call woven wire cloth?—A. That is right.

X Q. That would include rock screens, window screens?—A. Yes.

X Q. Why do you call rock screens or window screens cloth, and you do not call Exhibit 1, cloth?

\* \* \* \* \* \* \*

The WITNESS. Well it goes back long before the time I came with this Company. It is nomenclature that has been in existence before I came into the industry.

By Mr. TUTTLE:

X Q. You don't know why one is called cloth, and one called netting?—A. No, I do not.

On redirect examination the witness testified in part as follows:

R Q. I show you Illustrative Exhibit E, concerning which you were questioned by counsel for the plaintiff. You say you are familiar with the manufacture of that article?—A. I have seen it made.

R Q. Isn't it a fact that one wire is wrapped around or wrapped over the other wire, and affixed by some kind of a clamp?—A. No, it is twisted, not clamped.

The Government's third witness, H. D. Tuttle, secretary of John E. Roebling & Co., testified that he had been in the employ of said company for the last 39 years, and was familiar with the products manufactured by it; that merchandise like exhibit 1 was described in his company's invoices as galvanized woven netting, and in his opinion all wire netting was woven wire netting.

The Government's fourth witness, Robert C. Baker, employed in the general sales department of the Columbia Steel Co., testified that prior to his present employment he was in the sales department of the

American Steel & Wire Co., an affiliate of the Columbia Steel Co. and the United States Steel Corporation; that among the products manufactured by the American Steel & Wire Co. were woven wire fencing and woven wire netting similar to that represented by exhibit 1 herein; that for the past 30 years he had been familiar with all kinds of wire netting, and that in his opinion all wire netting was woven wire netting irrespective of the method of manufacture; that illustrative exhibit E was poultry netting or, possibly, stucco netting; and that in his opinion such netting was woven netting.

At this juncture a price list of the Columbia Steel Co., issued August 1, 1939, purporting to give prices of poultry netting "galvanized before weaving" and "galvanized after weaving" was admitted in evidence as illustrative exhibit G.

On cross-examination the witness testified that he regarded illustrative exhibit E as woven because the wires were fitted at different angles and interlaced and twisted together, although he admitted that he had never seen such merchandise manufactured.

The Government's fifth witness, H. R. Merriam, sales manager of the California Wire Cloth Corporation, testified that his corporation manufactured merchandise similar to exhibit 1. A price list of said corporation covering "hexagon and straight lined poultry netting," issued February 15, 1939, showing prices of such netting when galvanized before weaving and when galvanized after weaving, was admitted in evidence as defendant's illustrative exhibit H. The admission of all of these later exhibits was objected to by counsel for the plaintiff on the ground that they were not in existence at the time of the issuance of the Presidential proclamation, T. D. 44605, on February 5, 1931.

At this juncture, pages 88 and 89 of a catalog issued by the California Wire Cloth Corporation in 1926 and in force from that year until 1934 were admitted in evidence as illustrative exhibit J, again over objection of counsel for the plaintiff. On said page 88 there is a list of prices of poultry netting "galvanized before or after weaving," and on page 89 there are three illustrations of hexagonal twisted wire netting, and the words "galvanized before netting."

The Government then offered in evidence page 2 of a pamphlet issued by the United States Government entitled "Federal Specification for Fencing; Wire (Barbed, Netting and Woven), Black and Galvanized." On page 2 of the same pamphlet occurs the following:

C–2. *Workmanship.*—The manufacture of the types and sizes of fence covered by this specification and the zinc coating shall conform to the detail requirements under section E. Welding in the manufacture of the woven fence will not be permitted. This does not prevent the welding of one coil of line wire to another during manufacture. *On all Type C hexagon wire netting the zinc coating shall be done after weaving.* [Italics ours.]

The said pamphlet was admitted in evidence as illustrative exhibit K.

The Government also offered in evidence several purchase orders from the State of California and the United States Marine Corps to the California Wire Cloth Corporation, in which occur the words "Hexagon Poultry Netting * * * Galvanized Before Weaving," which orders were admitted in evidence as collective exhibit L. In the purchase order from the State of California occur the words "Hexagonal poultry netting galvanized before weaving," whereas in the purchase order from the United States Marine Corps reference is made to "wire cloth * * * galvanized."

The Government also offered in evidence the price list of the witness' company issued in January, 1935, in which prices are given of hexagon and straight-lined poultry netting when galvanized before weaving and when galvanized after weaving, which price list was admitted in evidence as illustrative exhibit M.

At the close of this hearing, an opportunity was given to counsel for the Government to produce, if possible, on the following day invoices showing sales of wire netting at or previous to the issuance of the Presidential proclamation in 1931.

At the last hearing, held at San Francisco, on November 27, 1941, the witness Merriam was recalled and produced copies of invoices submitted to customers running from July 5, 1934, to June, 1941, which invoices were admitted in evidence as collective illustrative exhibit N.

Counsel for the plaintiff then produced certain invoices showing sales of merchandise similar to exhibit 1 from the witness' company to Otis, McAllister & Co., during the year 1941, which were admitted in evidence as collective illustrative exhibit O.

The plaintiff's witness, Bonnett, was then recalled for the purpose of being cross-examined by counsel for the Government. On being shown collective illustrative exhibit O, he testified that the documents in question were made out by his company covering orders placed with the California Wire Cloth Corporation covering hexagonal wire netting.

On redirect examination the witness testified in part as follows:

R. Q. Mr. Bonnett, have you brought to this court a group of invoices covering the sales of a product like Exhibit 1 by your firm in 1936?—A. Yes.

   *      *      *      *      *      *      *

R. Q. Do they relate to foreign merchandise?—A. Yes, they do.

R. Q. Such as was imported here?—A. That is right.

Counsel for the plaintiff then offered the invoices in question in evidence, and over objection by counsel for the Government they were admitted as collective illustrative exhibit P. An examination of this exhibit discloses the fact that in every one of these invoices showing sales of merchandise like exhibit 1 during the year 1936, the

merchandise in question was described as "stucco netting," there being nothing said about the said netting being woven.

The witness Bonnett then proceeded to testify in part as follows:

R. Q. The invoices in this case describe the merchandise by the use of the term galvanized after weaving, or by the use of the term galvanized before weaving. Have you with you any specifications covering merchandise like Exhibit 1, which you received in the regular course of business from the shipper or seller or exporter of these goods?—A. Yes, I have a price list.

R. Q. Are they the documents which you now have in your hand?—A. Yes.

Over objection of counsel for the Government the documents were admitted in evidence as plaintiff's illustrative exhibit Q. This exhibit while consisting mainly of prices is partly in German and partly in English. In it occurs the following description of the merchandise, to wit, "hexagonal wire netting (galvanized after made)," there being no reference to the merchandise having been woven.

Upon this record and from a careful examination of all the exhibits we find the following facts:

1. In the wire netting constituting the imported merchandise at bar all of the wires run the entire length of the netting and none of them cross over from one side to the other.

2. Each wire is twisted twice around the neighboring wire on one side of it, then twice around the neighboring wire on the other side of it, and then twice around the first neighboring wire and so on throughout the entire length of the netting.

3. In the entire netting there are no weft wires because every wire runs the length of the material in the identical way that every other wire runs.

4. There is no evidence in the record that the terms "woven wire netting" or "galvanized before weaving" or "galvanized after weaving" were used in the trade and commerce of the United States as applied to the instant merchandise at or prior to the promulgation of the Prseidential proclamation, T. D. 44605.

Upon these facts we see no reason for not adhering to our previous decision in *Wilbur-Ellis Co.* v. *United States*, 6 Cust. Ct. 57, C. D. 426, wherein we held precisely similar merchandise not to be woven wire netting and therefore not subject to said Presidential proclamation. In that case we cited as authority the case of *Cron & Dehn Hardware Corp. et al.* v. *United States*, 18 C. C. P. A. 445, T. D. 44699. There the appellate court said:

The involved merchandise consists of warp wires twisted together. There are no weft or filling wires. The meshes are not fine, but, on the contrary, are approximately one inch in size.

As commonly understood, the terms "weave" and "weaving" contemplate both warp and weft threads. They are defined as follows:

*weave,* * * * 1. To entwine or lace together (threads or strips of pliable material) into a texture, especially by interlacing woof-threads among warp-

threads, as in a loom; also, to insert by intertwining; as, to *weave* fibers, yarns, etc. [Funk & Wagnalls New Standard Dictionary.]

*weaving.* The process of weaving consists in interlacing, at right angles, two or more series of flexible materials, of which the longitudinal are called warp and the transverse weft. \* \* \*. [Encyclopaedia Britannica.]

It will be observed that while in this case this court might well find the common meaning of the word "woven" from dictionary definitions, in the cited case the Court of Customs and Patent Appeals has judically defined the term and this court is bound thereby.

In the brief filed herein by *amici curiae*, counsel have gone into the congressional history in support of their contention that the wire netting constituting the imported merchandise at bar is a woven wire netting. Apart from the fact that the record discloses no invoice or catalog describing the instant merchandise as "woven" at or prior to the issuance of the Presidential proclamation, it is a well-established principle of law that resort may not be had to extrinsic facts which necessarily include congressional history where the statutory language is clear and unambiguous as in the instant case. *Old Colony Trust Co.* v. *Commissioner of Internal Revenue*, 301 U. S. 379; *Osaka Shosen Kaisha Line* v. *United States*, 300 U. S. 98, 101; *James F. White & Co.* v. *United States*, 23 C. C. P. A. 224, 227, T. D. 48061; *Cohn & Lewis* v. *United States*, 25 C. C. P. A. 220, T. D. 49335; *United States* v. *E. De Grandmont, Inc.*, 21 C. C. P. A. 17, 21, T. D. 46345. In the case last cited the Court of Customs and Patent Appeals said:

Throughout the entire history of the Supreme Court it has always consulted reports of committees and other pertinent extrinsic facts in order to get light on the congressional intent *where that intent was not shown by the context of the legislative provision or provisions under consideration.* Of course, such extrinsic facts were not resorted to for the purpose of creating doubt. Doubt as to the congressional intent must first exist. [Italics ours.]

Upon all the facts and the law applicable thereto, we therefore hold that the wire netting constituting the imported merchandise at bar not being woven is therefore not within the scope of the Presidential proclamation, T. D. 44605, and hence is properly dutiable at the rate of 45 per centum ad valorem under paragraph 397 of the Tariff Act of 1930 as manufactures of metal not specially provided for, as claimed by the plaintiff. That claim is therefore sustained; but as to all other merchandise the claims are overruled.

Judgment will be rendered accordingly.