**PINE HALL–POMONA CORPORATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Nos. C–35, C–187.**

United States District Court
M. D. North Carolina,
Winston-Salem Division.

Aug. 13, 1964.

Leon L. Rice, Jr., Womble, Carlyle, Sandridge & Rice, Winston-Salem, N. C., for plaintiff.

Alphonsus C. Murphy, Dept. of Justice, Washington, D. C., and Henry Fry, Asst. U. S. Atty., for Middle Dist. of N. C., for defendant.

GORDON, District Judge.

These actions were instituted to recover income and excess profits taxes, plus interest, paid to the Government for the calendar years 1950, 1951, and 1953–1956, inclusive. The actions involve allowances for percentage depletion under § 114 of the Internal Revenue Code of 1939 and § 613 of the Internal Revenue Code of 1954, computed pursuant to an Act of Congress of September 26, 1961 (Public Law 87–312, 75 Stat. 674) inasmuch as the plaintiff filed an election under the terms of the 1961 Act.

The facts are not in dispute and were submitted to the Court by stipulation. They are as follows:

During the years in question, the plaintiff was engaged in the business of manufacturing and selling burnt brick, and tile clay products, and in conjunction therewith mined the brick and tile clay needed for the manufacture of its products. Its products were sold primarily in the northwestern part of North Carolina and the southern part of Virginia. About 98 per cent of the products sold by the plaintiff were delivered by the plaintiff to the customer, delivery being made either by plaintiff's equipment or by private contract haulers. The remaining 2 per cent of the production was either picked up at plaintiff's plant by the customer or shipped by rail. Products shipped by rail were usually those products sold outside of the normal trade area and the freight was always prepaid by the plaintiff. The plaintiff had established list prices for its brick. There was a difference in the price for customers in Virginia as compared with North Carolina, but the difference in price was not based on the length of the haul but by reason of the difference in the method

of doing business. In Virginia, the plaintiff sold to dealers, rather than direct to customers as was its practice in North Carolina. As regards brick picked up at plaintiff's plant by customers, the price was $3.00 per thousand less than the delivered price.

Plaintiff utilized a zone system of prices with respect to clay pipe and allied clay products. The zones were based primarily upon the distance from the plant at which the pipe were produced, and the prices were higher as the distance increased.

With respect to all of its products, plaintiff operated on a system of delivered prices under which it did not make a separate charge for transportation or delivery cost. Its prices were established to cover all of the costs incurred in producing and selling its products plus profit.

After the instant actions were instituted, and at issue, and following the Supreme Court decision in the case of United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581 (1960), Congress passed P.L. 87–312 on September 26, 1961. Plaintiff, pursuant to the provisions of P.L. 87–312, filed with the District Director of Internal Revenue, a statement of election. The election, applicable to the years here involved, and as applied to the plaintiff's taxable years in question, provides that the plaintiff's deductions for percentage depletion under § 613(c) of the Internal Revenue Code of 1939, are to be computed upon the basis of 5 per cent of its gross income from the property, which the Act of September 26, 1961, defines to be 50 per cent of "the amount for which the manufactured products are sold during the taxable year."

The plaintiff filed amended returns, under the election provided by the terms of P.L. 87–312, and the amended returns for the years in controversy, showed an overpayment. The returns as amended were audited by the District Director of Internal Revenue who determined that the delivery costs of the plaintiff's manufactured products from its plant to its customers should be deducted from the gross sales price in determining gross income from the property.

The Act of September 26, 1961, P.L. 87–312, 75 Stat. 674, provides:

"That (a) Election for Past Years. —In the case of brick and tile clay, fire clay, or shale used by the mineowner or operator in the manufacture of building or paving brick, drainage and roofing tile, sewer pipe, flower pots, and kindred products (without regard to the applicable rate of percentage depletion), if an election is made under subsection (c), for the purpose of applying section 613(c) of the Internal Revenue Code of 1954 [sub-sec. (c) of this section] (and corresponding provision of the Internal Revenue Code of 1939) for each of the taxable years with respect to which the election is effective—

"(1) gross income from the property shall be 50 per centum of the amount for which the manufactured products are sold during the taxable year except that with respect to such manufactured products, gross income from the property shall not exceed an amount equal to $12.50 multiplied by the number of short tons used in the manufactured products sold during the taxable year, and

"(2) for purposes of computing the 50 per centum limitation under section 613(a) of the Internal Revenue Code of 1954 [subsec. (a) of this section] (or the corresponding provision of the Internal Revenue Code of 1939), the taxable income from the property (computed without allowance for depletion) shall be 50 per centum of the taxable income from the maufactured products sold during the taxable year (computed without allowance for depletion)."

The sole question for decision by the Court is as follows: For purposes of ar-

riving at the taxpayer's percentage depletion allowance, are the delivery costs of the taxpayer's manufactured products, incurred from its plant to the customer's job or other delivery site, to be deducted from the gross sales price in determining the taxpayer's gross income from the property?

Under the 1939 Code percentage depletion was computed by applying a percentage factor against the miner's gross income from mining. See Internal Revenue Code of 1939, § 114(b) (4) (B) (26 U.S.C. 1952 ed., § 114) where mining is defined as follows: "The term 'mining' as used herein shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product * * *." A number of court cases were instituted involving the question of what the "ordinary treatment processes" were as to certain minerals. In the cases of United States v. Cherokee Brick and Tile Co., 5 Cir., 218 F.2d 424 (1955) and United States v. Merry Brothers Brick and Tile Co., 5 Cir., 242 F.2d 708 (1957), the court determined that the depletion allowance for brick and tile clay should be based upon the value of the finished product, as there was no commercially marketable product prior to the finished product.

The Government did not agree with the view in United States v. Cherokee Brick and Tile Co., supra, and other cases holding similarly, and there resulted the decision in the case of United States v. Cannelton Sewer Pipe Co., supra. In United States v. Cannelton Sewer Pipe Co., supra, the Court held that raw clay and shale were the marketable mineral products, and the taxpayer's ordinary treatment processes ceased with the mining of these minerals; that all manufacturing processes subsequent to the mining of the minerals must be eliminated from the depletion base.

The decision in United States v. Cannelton Sewer Pipe Co., supra, though its application to the plaintiff is debatable, caused much consternation among taxpayers who had relied upon earlier decisions allowing depletion on the basis of the finished product. To relieve the dilemna, Congress passed the Act of September 26, 1961, P.L. 87–312, which limited the application of the principles of the decision in the case of brick and tile clay for all open taxable years prior to the time the Supreme Court granted certiorari in the case of United States v. Cannelton Sewer Pipe Co., supra.

In effect, P.L. 87–312 provided that miners of brick and tile clay, who elected to come under its provisions, could compute their depletion allowance for the open years upon the basis of 50 per centum "of the amount for which the manufactured products are sold during the taxable year." The plaintiff takes the position that the delivery expenses are a part of the "amount for which the manufactured products are sold", as the phrase is used in P.L. 87–312 and such expense should not be eliminated from the depletion base. The Government contends that Congress did not intend by the aforementioned language that the delivery expense from plant to customer should constitute a part of the depletion base upon exercising the election under P.L. 87–312.

█ A question of statutory construction and application involving the definition of terms and the application of them to the facts in this case arises. All rules for the interpretation of statutes have as their object the discovery of legislative intent. In Brotherhood of Local Firemen and Enginemen v. Northern Pacific Railway Co., 8 Cir., 274 F.2d 641 (1960), the Court said:

"Courts should, if possible, heed the intention and purpose of Congress in enacting legislation. * * They should avoid giving a statute any other construction than that which its words demand."

█ The general rule concerning statutory construction is that the letter

of the statute as written must not be unreasonably violated. It is only where the language used will bear two or more constructions or is of such doubtful or obscure meaning "that reasonable minds might be uncertain or disagree as to the meaning" that construction must be given by the Court. 50 Am.Jur., Statutes, § 225, Osaka Shosen Kaisha Line v. United States of America, 300 U.S. 98, 57 S.Ct. 356, 81 L.Ed. 532 (1937).

Judge Parker in State of Maryland, v. United States, 4 Cir., 165 F.2d 869, 872 (1947), said:

"[S]tatutes should receive a sensible construction, such as will effectuate the legislative intention."

In construing statutes, the words used should be interpreted in their "ordinary acceptation and significance and the meaning commonly attributed to them." The language should be read in its ordinary and natural sense. 50 Am.Jur., Statutes, § 328; United States of America v. Cooper Corporation, et al, 312 U.S. 600, 61 S.Ct. 742, 85 L.Ed. 1071 (1941).

There appears to be no question that P.L. 87–312, 75 Stat. 674, was passed as relief remedial legislation. Therefore, the court is of the opinion that a liberal, rather than a strict, rule of construction is applicable.

Prior to the passage of P.L. 87–312 (September 26, 1961), the governing statutes, applicable to the plaintiff's depletion allowance, specifically referred to the transportation factor in computing gross income, and provided that so much of the transportation expense of ores or minerals from the mine to the plant as not in excess of fifty miles, was to be included in the gross income from the property. The matter of transportation of the finished product from the plant to the consumer had been considered in a number of cases prior to September 26, 1961, Winnesboro Granite Corp. v. Commissioner, 4 Cir., 283 F.2d 307 (1960); Zonolite Co. v. United States, 7 Cir., 211 F.2d 508 (1954). The only transportation ever allowed under the law prior to September 26, 1961, was the transportation cost from the point of extraction from the ground to the plant.

The court, in arriving at the intent of Congress, is of the opinion that, inasmuch as the old law made specific reference to transportation expense, much significance should be attached to the failure of Congress in P.L. 87–312 to specifically eliminate transportation expenses as a part of the depletion base. The remedial legislation undoubtedly had as its purpose to bring certainty to the tax laws applicable to the industry, as the matter of what processes were to be included in gross income, in arriving at the depletion base, had been the source of much litigation. At the time of the passage of P.L. 87–312, the case of United States v. Cannelton Sewer Pipe Co., supra, had been decided, but it appears that the applicability of its principles to the plaintiff are debatable. Had Congress intended in the use of the phrase "the amount for which the manufactured products are sold" to exclude expenses of transportation from plant to customer, it would have been a simple matter to do so. Congress made no limitation, and the court believes the phraseology must be assigned its ordinary meaning. It is obvious to the court that Congress deemed it unwise and impractical to have a depletion base determined by some formula that had to be applied prior to the full consummation of the sale and marketing of the products. To infer otherwise, and not include delivery expense in the depletion base, leaves the application of the law in the instant case only a few degrees removed from the confusion under the law prior to September 26, 1961, for the reason that from the sale price the cost of transportation would have to be separated. Indeed, such would be a very difficult matter as the cost, direct and indirect, would have to be allocated and apportioned, and the ultimate determination of the amount paid by the customer attributable to the delivery cost would be a mere guess, and the subject of litigation and controversy. It is not believed that

Congress, in view of the extreme difficulties experienced in applying the "gross income from mining" formula to arrive at the depletion base under the old law, intended to enact legislation filled with virtually the same difficulties.

The court is aware of the fact that, according to the stipulations, the parties have agreed upon an amount attributable to delivery, but such does not mitigate from the difficulties involved in reaching such estimate.

The defendant contends that inasmuch as the cost of transportation of the finished product from the manufacturer's plant to the purchaser had never been allowed prior to P.L. 87–312 that such is precedent to support a construction of P.L. 87–312 that such costs not be allowed as a part of the depletion base under P.L. 87–312. This view overlooks the fact that a new and completely different formula was provided under P.L. 87–312, that is, "the amount for which the manufactured products are sold" while under the old law it was the "gross income from mining". It appears to the court that Congress intended by P.L. 87–312 to provide a simple, practical rule which could be easily applied to compute the percentage depletion deduction, realizing that a dollar basis must first be arrived at, and to accept the view of the Government would do violence to what appears to the court to have been a moving reason for the new formula.

In construing statutes, the court is required to give the words used their natural, usual and ordinary meaning and significance. The direct question is what was meant by "amount for which the manufactured products are sold?" It appears to the court that the commonly accepted meaning of the subject phase could only reasonably be said to include the total price received by the seller from the purchaser, undiminished by the cost of delivery. It would appear to be arbitrary, in arriving at the selling price, to simply pick out one specific item of cost and determine that it does not constitute a part of the selling price. The plaintiff operates on a system of delivered prices and makes no separate charge for costs of delivery. Delivery of the products was a part and parcel of the sales agreement to be performed by the plaintiff. In the case of Nephi Processing Plant, Inc., v. Western Cooperative Hatcheries, 10 Cir., 242 F.2d 567 (1957), the court stated:

> "The sale of personal property in the usual sense ordinarily means the passing of title and possession for money or other consideration which the buyer pays or promises to pay."

The court holds that the plaintiff is entitled to recover. It is concluded that Congress included in the statute the definition here under consideration in order to, in addition to furnishing relief for the taxpayers in the subject industry, clarify the law. There is no reason to believe that the plaintiff and others similarly situated would have accepted the principles of United States v. Cannelton, supra, as binding on them as such case involved fire clay for which there was a ready market. The evidence is to the effect that there was no market for brick and tile clay. To give the construction asked for by the Government leads again to fiction rather than truth and confusion rather than clarification, and in the case of the plaintiff to establish with accuracy the delivery cost a task of substantial proportions.

Under P.L. 87–312, gross income is defined as 50 per cent of the sales price, with no limitation or qualification with respect to the delivery costs. The plaintiff made no separate charge for delivery. Therefore, "the amount for which the finished products are sold" means the amount the taxpayer charged and received for its products.

Let the plaintiff present a judgment in accordance with the findings and conclusions herein.