MATTER OF SOUTHERN PACIFIC RAILROAD BRIDGE

In Fine Proceedings

ELP 10/2.52

*Decided by Board May 18, 1977*

(1) This case involves fine proceedings instituted against the Southern Pacific Railroad under section 271(a) of the Immigration and Nationality Act for permitting the entry without inspection of five aliens into the United States via their railroad bridge near El Paso, Texas.

(2) On April 12, 1973, the Service and Southern Pacific Railroad entered into an agreement under which the Southern Pacific would permit the Service, at its own expense, to install, maintain and operate a gate on the bridge for the purpose of enforcing the immigration laws. Both the Service and the railroad recognized that aliens were using the bridge to enter the United States illegally. Subsequently, the Service requested the railroad to install certain planking on the bridge to provide safer access to the gate by Service officers. The railroad refused repeated Service requests to install this planking for cost considerations and because they claimed it would be a fire hazard. After repeated requests, the Service advised that if the planking were not installed, fine proceedings would be instituted against the railroad under section 271(a) of the Act.

(3) Southern Pacific is liable for the fines under section 271(a) of the Act because its railroad bridge is an international bridge which provided a means for, and which was used by, Mexican aliens to enter the United States without inspection by immigration authorities. Lack of knowledge by Southern Pacific that the aliens had entered the United States does not shield the railroad from liability. Liability under section 271(a) of the Act is absolute.

(4) Prior to these proceedings, no fine proceedings had been instituted against the Southern Pacific at El Paso. Since institution of these proceedings, the railroad has begun to guard the gate with its own personnel and improved the gate. Southern Pacific in El Paso has had a long history of cooperation with the Service, is active in the apprehension of alien trespassers, and continues to cooperate with the Service. In view of Southern Pacific's past record of cooperation with the Service, and current efforts to carry out its responsibilities under section 271(a) of the Act, the fines imposed will be remitted.

In re: SOUTHERN PACIFIC RAILROAD BRIDGE, a railroad bridge crossing the Rio Grande River between El Paso, Texas and Juarez, Chihuahua, Mexico. Aliens involved: Mario Romero-Leon, Manuel Godines, Rogelio Amaya-Quintana, Jesus Duenez-Baiez and Ernesto Villegas-Quintana

Basis for Fines: Act of 1952—Section 271(a) [8 U.S.C. 1321(a)]

Interim Decision #2583

ON BEHALF OF CARRIER:
Wyndham K. White, Esquire
Kemp, Smith, White, Duncan and
Hammond
P.O. Drawer 2800
El Paso, Texas 79999

ON BEHALF OF SERVICE:
Mary Jo Grotenrath
Appellate Trial Attorney
E. M. Trominski
Trial Attorney

BY: Milhollan, Chairman; Wilson and Maniatis, Board Members.

In a decision[1] dated April 27, 1976, the District Director determined that the Southern Pacific Transportation Company (herein identified as Southern Pacific) had incurred liability to administrative penalties totaling $5,000, $1,000 as to each of the aliens named above, for failure to prevent their unauthorized landing in the United States as provided in section 271(a) of the Immigration and Nationality Act. The District Director found factors present which merited mitigation of the fines in the amount of $200 for each violation or a total of $1,000. Thus, fines totaling $4,000 were imposed against Southern Pacific. The respondent has appealed. The appeal will be dismissed in part and sustained in part and the fines remitted.

The record contains a memorandum report (dated December 17, 1975) issued by the Acting Chief Border Patrol Agent of the Immigration and Naturalization Service, El Paso, Texas to the District Director of the Service located in El Paso. In that document it is reported that on December 16, 1975, five aliens entered the United States without inspection via the Southern Pacific railroad bridge in El Paso. The location of the bridge was described as east of and near the Paso Del Norte Port of Entry in El Paso, Texas. It was also reported that the aliens were apprehended by agents of the border patrol; and that they made sworn statements following their arrest. The report indicates that in the sworn statements, the aliens admitted that they entered the United States without inspection; that they were not in possession of immigration documents when they entered; and that they were neither United States citizens nor lawful permanent resident aliens at the time of their entry. The aliens stated that no railroad guards or other employees were on or near the Southern Pacific railroad bridge when they crossed it. The Border Patrol report indicated that Southern Pacific or its employees did not inform the Service of the entry by the five aliens across its bridge and that the company did not assist the Border Patrol

---

[1] Southern Pacific and the Atchison, Topeka and Santa Fe Railway Company (partial owner of another railroad bridge in El Paso, Texas) were separately fined under section 271(a) of the Act in a consolidated decision of the District Director dated April 27, 1976. In view of factual differences in each case and in the interest of orderly procedure, we shall treat these cases independently and issue separate orders.

210

in the apprehension of the aliens. The record also includes the sworn statements of the five aliens who were apprehended by the Border Patrol.

A Notice of Intention to Fine under the Immigration and Nationality Act was issued by the District Director to Southern Pacific on January 2, 1976. In that notice, a summary of the aforementioned facts was alleged and the company was notified that the imposition of fines pursuant to section 271(a) of the Act was indicated. Southern Pacific was given 30 days to file a written defense to the allegations contained in the notice.

Southern Pacific responded to the notice in a letter to the District Director dated January 27, 1976. In that letter, it denied knowledge of or responsibility for the landing of the five aliens via the Southern Pacific railroad bridge on December 16, 1975. Southern Pacific contended that section 271(a) of the Act is not applicable to it; and that the company's police force is employed only to protect railroad property and has no authority to apprehend aliens entering the United States unlawfully. Southern Pacific submitted that the responsibility for enforcing the immigration laws lies with the Service. The company alluded to an agreement between it and the Service, in which the Service agreed to construct, maintain and operate a gate on the bridge at no cost to Southern Pacific; and that the Service has the only key to the gate lock and that, therefore, it has exclusive control over opening and closing the gate. Southern Pacific further stated that the imposition of fines against it was an act of coercion because Southern Pacific refused to comply with a Service request that it plank the bridge at the railroad company's expense. Southern Pacific requested termination of these proceedings; or, alternatively, requested mitigation or remission of the fines.

A hearing was conducted before the District Director on March 2, 1976, in order to afford Southern Pacific an opportunity to present evidence. Ray Upham, an engineer who had been employed by Southern Pacific for a period of 36 years, testified that the Southern Pacific railroad bridge was constructed by the United States Government and that the ownership of one half of the bridge was subsequently assigned to Southern Pacific (that portion of the bridge which extends from the middle of the Rio Grande to the bank of the river on the United States side is owned by Southern Pacific). Mr. Upham testified that as one of the representatives of Southern Pacific he participated in negotiations with officials of the Service for the construction of a gate in the middle of the Southern Pacific railroad bridge. According to his testimony, negotiations began in 1970 and extended over a period of about two and a half years before a final agreement was reached. Mr. Upham also stated that the United States Government incurred the expenses of construction, maintenance and operation of the gate; that the Govern-

ment opened and closed the gate; and that the Government possessed the only key for locking the gate.

Various copies of correspondence attesting to the negotiations of the parties are of record. One letter dated October 28, 1970, reflects the initial request by the Service for authority from Southern Pacific to construct the gate. The Service pointed out in its letter that by constructing the gate ". . . it will not be necessary to maintain a constant vigil on this one avenue of entry." The purpose of the gate was to prevent aliens from entering the United States without inspection via the bridge. A copy of the aforementioned agreement (Ex. 1) was made a part of the record of the hearing. That agreement which was executed on April 12, 1973, provided, in substance, that the Service and Southern Pacific agreed to the installation of a gate on the bridge; that each recognized the fact that aliens had been using the bridge for the purpose of illegal entry into the United States; that Southern Pacific would permit the Service to enter upon its bridge to construct, maintain and operate a gate for the purpose of enforcing the immigration laws; that the cost of these activities would be borne by the Service; and that the Service would operate the gate without delaying the movement of trains across its bridge. The agreement was signed by the Vice-President of Southern Pacific and the Assistant Regional Commissioner (Administrative Services) of the Service assigned to San Pedro (Terminal Island), California. There is no indication in the record that the agreement is not currently in effect.

The record reveals that each day a single freight train, owned and operated by the Mexican Railway Company, originates in Juarez, crosses the Southern Pacific bridge, enters the Southern Pacific yards, deposits its freight and then returns over the bridge to Juarez. This apparently represents normal international train movement on the Southern Pacific bridge. After the above-described agreement became effective and the gate was constructed on the bridge, the agents of the Border Patrol opened the gate in order to permit trains to cross the bridge and then closed the gate. Prior to the imposition of the fines in this case, the Service instituted a procedure of locking the gates in the open position between sunrise and sunset.

The transcript discloses that Southern Pacific employs a private police force which guards railroad property on a 24-hour basis against vandalism and theft; that the Southern Pacific and its police force have cooperated in the past with the Service; and that on many occasions have apprehended alien trespassers on its property and released them to the custody of the local police or the Border Patrol.

Correspondence is of record which shows that the Service has made repeated requests to Southern Pacific that it install planking on its bridge for the safety of its Border Patrol agents who walk onto the

bridge in order to open and close the gate. The railroad has refused to erect planking because it does not want to incur the expense of such construction. At the hearing, counsel pointed out that planking would create a fire hazard on the bridge. Counsel also suggested that the fines in question were imposed because Southern Pacific was reluctant to install planking on its bridge. In a letter dated November 28, 1975 (Ex. 9), the Service informed Southern Pacific that:

> . . . Our officers advise that there is a three foot space between the end of the beam and the bridge side rails which is a safety hazard to our officers when walking on the bridge to and from the gate. Therefore, it is our intention to proceed with consideration of fine proceedings under section 271(a) of the Immigration and Nationality Act (8 U.S.C. 1321).

This letter was signed by the Regional Commissioner of the Service at San Pedro, California. A second letter from the Service to Southern Pacific dated January 7, 1976, repeats the Service request that Southern Pacific install planking or other suitable devices on its bridge in order to permit the safe use of the gate. In that letter, the Service reiterates its intention to institute fine proceedings, ". . . if assistance and cooperation of the transporation company is not received. . . ." We note that prior to the imposition of the fines that are now before us for review, the Service had not instituted fine proceedings against Southern Pacific in El Paso, Texas.

Subsequent to the appeal and prior to the oral argument before this Board, counsel for the respondent, submitted an affidavit from Ray Upham dated September 3, 1976. We note that Mr. Upham previously testified before the District Director on behalf of the respondent. In his affidavit, he states that since these proceedings have begun, Southern Pacific has enlarged the height and width of the gate on its bridge at its own expense. Mr. Upham also stated that the Border Patrol has withdrawn its agents from operating the gate, and that employees of Southern Pacific have undertaken the task of operating the gate. He further indicated that Service personnel and Southern Pacific employees are assisting each other in regard to the alien situation in El Paso.

Photographs and diagrams depicting the gate alterations accompanied the affidavit. Also submitted by counsel, is an affidavit from Tony J. Hurley, a lieutenant in charge of the Southern Pacific Police Department, in which he describes the efforts of his men to operate the gate and to cooperate with the Border Patrol. A second document originated by Lieutenant Hurley to counsel for the respondent indicates that 1,864 aliens were arrested by the Southern Pacific Police Department in 1975 and that over 150 aliens were apprehended each month in 1976. Copies of memoranda from the Chief Border Patrol Agent in El Paso to the District Director in El Paso and the Regional Commissioner in El Paso dated August 20, 1976, attest to the cooperation between the

Border Patrol and the employees of Southern Pacific. Various photographs of the Southern Pacific bridge facilities and its police activities were also submitted by counsel.

Section 271(a) of the Act[2] provides, in pertinent part, that the owners of an international bridge who provide a means for an alien to enter the United States have a duty to prevent the unauthorized landing of such alien in the United States. Under the provisions of this section, any person who fails to comply with the requirements shall be liable to an administrative penalty. The Attorney General may, in his discretion, remit or mitigate a penalty that has been imposed. Counsel argues that section 271(a) does not apply to the Southern Pacific bridge because it is used by its owners for the purpose of operating freight trains from Mexico to the United States and that it is not engaged by its owners for passenger transportation. We find, however, that the Southern Pacific bridge has been used by Mexican aliens as a means of entering the United States without undergoing inspection by Service officials.

In determining the applicability of section 271(a) to the present case, we recognize that this section is a substantial reenactment of section 10 of the Immigration Act of February 5, 1917, as amended by section 27 of the Immigration Act of 1924. Our review of the legislative history[3] of section 10 of the Act of 1917 fails to show that Congress intended to distinguish the bridge described in this case from other types of international bridges. In fact, it is clear that Congress specifically added the phrase ". . . or providing a means for an alien to come to the United States . . ." in section 10 of the Immigration Act of 1917 in order to include international bridges and toll roads within the purview of the statute. *The Habana*, 63 F.2d 812 (2 Cir. 1933). See also 33 Op. Att'y Gen. 362, 363 (1922). In *Osaka Shosen Kaisha Line* v. *U.S.*, 300 U.S. 98 (1936), the Supreme Court held that the words in section 10 of the Act of

---

[2] Section 271(a) of the Immigration and Nationality Act provides that:

It shall be the duty of every person, including the owners, masters, officers, and agents of vessels, aircraft, transportation lines, or international bridges or toll roads, other than transportation lines which may enter into a contract as provided in section 238, bringing an alien to, or providing a means for an alien to come to, the United States (including an alien crewman whose case is not covered by section 254(a)) to prevent the landing of such alien in the United States at a port of entry other than as designated by the Attorney General or at any time or place other than as designated by the immigration officers. Any such person, owner, master, officer, or agent who fails to comply with the foregoing requirements shall be liable to a penalty to be imposed by the Attorney General of $1,000 for each such violation, which may, in the discretion of the Attorney General, be remitted or mitigated by him in accordance with such proceedings as he shall by regulation prescribe. Such penalty shall be a lien upon the vessel or aircraft whose owner, master, officer, or agent violates the provisions of this section, and such vessel or aircraft may be libeled therefore in the appropriate United States court.

[3] See S. Rep. No. 352, 64th Cong., 1st Sess. pp. 10, 11 (1916); S. Doc. 451, 63d Cong., 2nd Sess. p. 7 (1915).

1917 were plain and that therefore the words required no construction. The Court pointed out that where the language is clear, it is conclusive.

We conclude that section 271(a) is applicable to international bridges; that the Southern Pacific bridge is an international bridge; and that, therefore, the statute is applicable to it.

Counsel submits that Southern Pacific had no knowledge of the unauthorized landing of the five aliens described in this case, and that, therefore, it should not be held liable under section 271(a) of the Act. In enacting section 10 of the Act of 1917, Congress intended to impose a strict liability on those persons who violated its provisions by failing to prevent an unauthorized landing by an alien.[4] In *Osaka Shosen Kaisha Line v. U.S., supra*, liability under section 10 of the Immigration Act of 1917 was incurred when a transiting passenger departed the vessel in the United States, although there was no intent on the part of the vessel owner to leave the alien there. In *Matter of S.S. "Sarcoxie,"* 1 I. & N. Dec. 250 (1942), we held that liability under section 10 of the Immigration Act of 1917 is incurred if an alien has landed without permission and that whether or not due diligence is exercised is immaterial. *Matter of Plane N–8224–II*, 6 I. & N. Dec. 594 (1955); *Matter of Taca International Airlines Plane "Flight 110,"* 13 I. & N. Dec. 390 (1969). It is clear that Congress did not intend that the exercise of due diligence by or the intention of the person subject to the statute should be material elements in determining whether liability has been incurred. Likewise, Congress did not intend that actual knowledge of the unauthorized landing of an alien should be an essential ingredient for the imposition of a fine under the statute. If that were the case, a carrier or owner of an international bridge or toll road could always disclaim liability by simply stating that he did not have "actual knowledge". This construction, if adopted, would be unreasonable and would contradict the express terms of the statute. Cf. *The Manuel Arnus*, 75 F.2d 943 (2 Cir. 1935), cert. denied 295 U.S. 756 (1935).

We find that five aliens landed in the United States without authority via the Southern Pacific bridge on December 16, 1975, and that Southern Pacific or its employees did not prevent their unauthorized landing. Therefore, we conclude that the respondent is liable under section 271(a) of the Act for failing to prevent the unauthorized landing of aliens.

This case is complicated by the fact that the Service sought and obtained a written agreement with Southern Pacific which affected the manner in which aliens were prevented from entering the United States via the Southern Pacific bridge. By virtue of this agreement, Service personnel were permitted by Southern Pacific to enter onto its property

---

[4] See HR 10384, 64th Cong., 1st Sess., Cong. Rec. 5029–5030 (1916).

in order to construct, maintain and operate a gate (at government expense) which was used to deter aliens from crossing the bridge. After the gate was constructed and was manned by Border Patrol agents, it became evident that the Service had undertaken the responsibility for preventing the unauthorized landing via the Southern Pacific bridge. The operation of the gate by the Service apparently continued for several years until the Service became concerned about the hazards to its personnel who walked onto the bridge to operate the gate. The Service then sent numerous letters to Southern Pacific requesting that Southern Pacific install planking on its bridge at its expense in order to neutralize the hazards. For reasons of cost and perhaps fire safety, Southern Pacific refused to comply with the repeated requests. In a number of communications with Southern Pacific, the Service made it clear that unless the company installed planking or some other devices to prevent hazards on the bridge, the Service would institute fine proceedings against it.

We find that the conduct of the Service in its dealings with Southern Pacific has been inconsistent and irregular. It is obvious that the Service actually sought to erect a gate on railroad property in order to minimize its own surveillance of aliens attempting surreptitious entries across the border. Unfortunately, the operation of the gate by Service personnel over a period of years caused Southern Pacific to rely on the government to fulfill its own statutory responsibility.

Prior to these proceedings, Southern Pacific in El Paso had not incurred liability under section 271(a) of the Act. That company has a long history of cooperation with the Border Patrol and other branches of the Service. In fact, we find that Southern Pacific has now improved the effectiveness of the gate on its bridge at its own expense and has undertaken to man the gate without the assistance of the Border Patrol. We also find that it is active in the apprehension of alien trespassers and continues to cooperate with the Service.

We conclude that, in view of Southern Pacific's past record of cooperation with the Service and its current efforts to assume its responsibility under section 271(a) of the Act, remission of the fines imposed by the Service is appropriate. Accordingly, that part of the appeal requesting termination of these proceedings will be dismissed; and that part of the appeal requesting remission of the fines will be sustained pursuant to 8 C.F.R. 3.1(b)(4) and Part 280.

ORDER: That part of the appeal requesting termination of the fines proceedings is dismissed.

FURTHER ORDER: That part of the appeal requesting remission of the fines is sustained. The fines are hereby remitted.

Board Member Irving A. Appleman abstained from consideration of this case.