Ronald H. and Martha M. YOCUM, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 03–84 T.

United States Court of Federal Claims.

July 1, 2005.

Michael A. Guariglia, McCarter & English, Newark, New Jersey, for plaintiff.

Benjamin C. King, Jr., United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General Eileen J. O'Connor, for defendant.

**OPINION**

ALLEGRA, Judge.

It is chronicled that Thomas Scott Baldwin, the inventor of the modern parachute, helped finance his other inventions, including improvements in the dirigible, by offering to parachute to the ground from a balloon, at the rate of a dollar per foot of descent. A star attraction at many fairs, Captain Baldwin, on January 30, 1885, made one of his most famous and lucrative jumps, receiving the unheard of sum of $1000 to parachute into San Francisco's Golden Gate Park. This tax refund case involves a "golden parachute" of a different sort, albeit one that, like Baldwin's, showered benefits upon its owner. In the case *sub judice*, a corporate executive received those benefits, per agreement, in

the form of previously-issued stock that became vested and unrestricted when his company transferred a significant portion of its assets to a joint venture. At issue is the tax treatment of this transaction and, specifically, whether the subject transfer of assets triggered an "excess parachute payment" subject to the excise tax imposed by section 4999 of the Internal Revenue Code of 1986 (26 U.S.C.) (hereinafter "the Code").

## I. Fact Summary

The facts in this case are largely stipulated and, insofar as relevant, are as follows:

In 1989, Dr. Ronald H. Yocum ("Dr. Yocum") began working for Quantum Chemical Corporation, and, in 1993, was named its president and chief executive officer. On October 1, 1996, Quantum became a subsidiary of Millennium Chemical, Inc. ("Millennium"). A week later, on October 8, 1996, Millennium and Dr. Yocum entered into a Restricted Stock Agreement ("the restricted stock agreement"). Pursuant to that agreement, Dr. Yocum received 224,026 shares of common stock of Millennium that were subject to restrictions and a vesting schedule. By check dated December 15, 1996, Dr. Yocum paid $.01 for each share of the restricted stock, for a total of $2,240.26. The restricted stock agreement prohibited Dr. Yocum from selling, transferring, pledging, hypothecating, assigning or otherwise disposing of the restricted stock, except as set forth in the Millennium Long Term Stock Incentive Plan or the agreement. Under an acceleration clause, as long as Dr. Yocum was employed by Millennium or a subsidiary of Millennium, upon a "change in control" all unvested shares of the restricted stock, whether or not earned, would become immediately vested and cease to be restricted. The restricted stock agreement defined "change of control," as "either a Change in Control of the Company or a Change in Control of the Employer," and provided detailed definitions of both. Dr. Yocum did not include the value of the stock in his 1996 taxable income because it was subject to restrictions on transferability and substantial risks of forfeiture within the meaning of section 83 of the Code.

On March 3, 1997, Quantum became Millennium Petrochemicals Inc. ("MPI"), which was a wholly-owned fifth tier subsidiary of Millennium. Plaintiff retained his position as president and chief executive officer.

In January of 1997, the senior management of Millennium and Lyondell Petrochemical Company ("Lyondell") began to explore combining their ethylene and polyethylene businesses. These negotiations progressed to a point that, in February of 1997, the companies executed a confidentiality and standstill agreement. By the middle of June of that year, the companies decided to form a joint venture, and reached a preliminary agreement on their respective contributions and relative ownership percentages. On July 25, 1997, they executed a master transaction agreement, which was amended on October 10, 1997. The agreement provided that, in exchange for a contribution of $570,000, Lyondell would receive a 57 percent interest in the partnership, while for $430,000, Millennium would receive a 43 percent interest therein.

On October 17, 1997, Millennium and Lyondell filed a joint proxy statement with the Securities and Exchange Commission, which detailed the proposed formation of the proposed joint venture, Equistar Chemicals, L.P. ("Equistar"). While noting that the board of directors of both companies had unanimously approved the deal, the proxy stated that the joint venture would not become effective until a majority of both company's shareholders had approved the deal. Upon that approval, MPI was to contribute to Equistar substantially all of its assets comprising its polyethylene and related products businesses, thereby triggering a series of other arrangements made between the companies. Regarding control of Equistar, the proxy statement revealed that "Lyondell and Millennium will have an equal voice in the most important joint venture decisions," such as changes in basic scope of business, merging or combining with another business, and issuing or repurchasing equity securities of the Equistar. However, the joint venture agreement provided that lesser decisions could be made by Lyondell's representatives alone. Among these was the selection of the

Equistar's chief executive officer ("CEO"), which the joint venture agreement stated would be Lyondell's current CEO, with the current vice president of MPI becoming the president and chief operating officer of Equistar.

As described in the proxy statement, the joint venture agreement provided that the day-to-day operations of Equistar would be run by executive officers under the supervision of the Partnership Governance Committee. Although Lyondell and Millennium were to have an equal number of representatives on that committee, Lyondell was to exercise greater control—

> In general, the approval of two or more Representatives acting for Lyondell GP will be necessary and sufficient for the Partnership Governance Committee to take any action; however, the Partnership Governance Committee may not take certain actions unless they are approved by two Representatives of Lyondell GP and two Representatives of Millennium GP, as described below.... This means, in effect, that Lyondell's Representatives will control the Partnership Governance Committee (and, as a result, the Partnership) except where the approval of Millennium's Representatives is required.

The proxy statement explained that the ownership split was decided after evaluating the contributions and debts that each company brought to Equistar.

On December 1, 1997, Millennium and Lyondell completed the joint venture to form Equistar. On that date, a group of nine institutional investors that owned shares in Millennium also owned at least 18.29 percent of the total outstanding shares of Lyondell—hereinafter, these shareholders will be referred to as the "overlapping shareholders." [1] At some point after December 1, 1997, Millennium determined that MPI's contribution of assets to Equistar was a "change in control," as defined in its restricted stock agreement with Dr. Yocum. It, therefore, treated the stock as vesting on that date, no longer subject to restrictions on transferability or

substantial risks of forfeiture. As a result, Dr. Yocum was deemed to have realized taxable compensation income. Millennium treated this compensation as an "excess parachute payment," within the meaning of section 280G(b)(1) of the Code, setting the amount of such excess at $5,733,409. Pursuant to section 4999 of the Code, Millennium withheld $1,146,682 from Dr. Yocum's 1997 wages as an excise tax on the excess parachute payment and paid over such amount to the Internal Revenue Service ("IRS"), along with other employment taxes on Dr. Yocum's wages withheld under section 3402 of the Code.

On April 2, 1998, Dr. Yocum retired from Millennium. Soon thereafter, on April 15, 1998, he and his wife, Martha M. Yocum, timely filed a joint U.S. Individual Income Tax Return, Form 1040, for the calendar year 1997, and paid the taxes reported due. That return reflected an excess parachute payment excise tax of $1,146,682. Dr. Yocum and Mrs. Yocum (plaintiffs) twice filed amendments to this return on IRS Forms 1040X to reflect revised IRS Forms K–1 received by them after April 15, 1998. On March 31, 2000, they filed a third amended return on which they requested a refund of federal taxes in the amount of $1,146,682. On January 18, 2001, the IRS denied this refund claim.

On January 14, 2003, plaintiffs brought suit in this court, seeking a refund of $1,146,682, plus interest, for overpayment of federal taxes for their tax year 1997. Plaintiffs assert that the transfer of assets by Millennium to Equistar did not constitute a change "in the ownership of a substantial portion of the assets" of Millennium under section 280G(b)(2)(A)(i)(II) of the Code and, therefore, did not trigger the section 4999 excise tax upon the vesting of Dr. Yocum's restricted stock in Millennium. On February 13, 2004, plaintiff filed a motion for summary judgment, and on April 7, 2004, defendant filed a cross-motion for summary judgment. Oral argument was heard on January 26, 2005. Supplemental briefs discussing the

---

1. The interests of these investors in Lyondell ranged from a high of 7.37 percent of total Lyondell shares to a low of 0.08 percent of such

shares. Four of the nine investors each had interests amounting to less than one percent in Lyondell shares.

legislative history of the Code provisions at issue were filed by the parties on February 25, 2005, and March 11, 2005.

## II. DISCUSSION

The issue presented by the pending cross-motions for summary judgment[2] is whether the transfer of assets from Millennium to Equistar constituted a change "in the ownership of a substantial portion of the assets" of Millennium, within the meaning of section 280G of the Code. If such a change occurred, it triggered an excise tax, under section 4999 of the Code, on a significant portion of the value of the stock that became vested, upon the transfer of assets, under Dr. Yocum's restricted stock agreement. Before turning to the parties' arguments on this point, some background is in order.

### A. Statutory and Regulatory Background

"Golden parachutes" refer to "agreements between a corporation and its top officers which guarantee those officers continued employment, payment of a lump sum, or other benefits in the event of a change of corporate ownership." *Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 3 n. 2, 105 S.Ct. 2458, 86 L.Ed.2d 1 (1985). These agreements ordinarily have two features: (i) a change of control clause, which allows the executive to vest certain benefits upon a specified shifting in, for example, the ownership of the company stock or membership of its board; and (ii) a termination clause, which provides for certain payments or benefits if the executive is dismissed or her job responsibilities or status diminished. Drew Harrison Campbell, *Golden Parachutes: Common Sense from the Common Law*, 51 Ohio St. L.J. 279, 280 (1990). Both features were present in the restrictive stock agreement entered into by Dr. Yocum. Companies use "golden parachute" payments not only to prevent their executives, fearful of losing their jobs, from obstructing beneficial changes in control, but also to make the companies less attractive in

the event of a hostile takeover. 7 Mertens Law of Fed. Income Tax'n (hereinafter Mertens) § 25E:33 (2005); Dana M. Leonard, *Golden Parachutes and Draconian Measures Aimed at Control: Is Internal Revenue Code section 280G the Proper Regulatory Mode of Shareholder Protection*, 54 U. Cin. L.Rev. 1293 (1986) (hereinafter "Leonard"). Prior to 1984, such payments were treated as a currently deductible business expenses under section 162(a)(1) of the Code, to the extent they were deemed reasonable compensation for services rendered. *See* 26 C.F.R. § 1.162–7(a) (1985); *Pepsi–Cola Bottling Co of Salina, Inc. v. Commissioner*, 528 F.2d 176, 179 (10th Cir.1975); Mertens, *supra*, at § 25E:33. And, correspondingly, they were immediately included in the recipient's gross income. *See* Leonard, *supra* at 1297–1298; Ryan Miske, "Can't Cap Corporate Greed: Unintended Consequences of Trying to Control Executive Compensation Through the Tax Code," 88 Minn. L.Rev. 1673, 1675–76 (2004) (hereinafter "Miske").

In 1984, in the midst of a surge in corporate takeovers, Congress became alarmed over the increasing use of golden parachutes. As reflected in a report by the Staff of the Joint Committee on Taxation, Congress was concerned that golden parachutes "hindered acquisition activity in the marketplace," "tended to encourage the executives … to favor a proposed takeover that might not be in the best interests of the shareholders or others;" and "tended to reduce amounts which might otherwise be paid to target corporation shareholders." Staff of Joint Comm. on Tax'n, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, 98th Cong., 2d Sess. 199, 199–200 (J. Comm. Print 1984). The Senate Finance Committee expressed its disquietude on this subject reportedly as follows:

> The committee … is concerned that in many instances golden parachute contracts do little but assist an entrenched management team to remain in control. They also may provide corporate funds to subsidize officers or other highly compensated indi-

---

**2.** Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Hunt v. Cromartie*, 526 U.S.

541, 549, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

viduals. The committee is unwilling to permit the tax law to be used as a subsidy in such situations. In fact, the committee believes that a tax penalty should be enacted in those situations.

Senate Print 98–169, Deficit Reduction Act of 1984: Explanation of Provisions Approved by the Committee on March 21, 1984, at 195 (April 2, 1984) (hereinafter "Senate Print"); *see also Cline v. Comm'r,* 34 F.3d 480, 481–82 (7th Cir.1994); *Square D Co. v. Comm'r,* 121 T.C. 168, 214, 2003 WL 22221166 (2003); Michael S. Sirkin & Elena Eracleous, "Dealing with Golden Parachutes Immediately Before and After the Deal Closes," SG061 ALI–ABA 493, 495 (2002).

The penalty presaged by the foregoing passage materialized in two provisions of the Deficit Reduction Act of 1984, Pub.L. No. 98–369, 98 Stat. 678 (1984). As noted by the Seventh Circuit, "[t]he provisions contain a complex set of definitions and interrelated applications." *Cline,* 34 F.3d at 482. In section 280G of the Code, Congress flatly denied corporations a deduction for any portion of a parachute payment that qualifies as an "excess parachute payment." Section 280G(b)(1) defines the latter term as the amount equal to the excess of any "parachute payment" over the "base amount allocated to such payment." 26 U.S.C. § 280G(b)(1) (2000). For this purpose, a "parachute payment" is "any payment in the nature of compensation to (or for the benefit of) a disqualified individual if—

(i) such payment is contingent on a change—

    (I) in the ownership or effective control of the corporation, or

    (II) in the ownership of a substantial portion of the assets of the corporation, and

(ii) the aggregate present value of the payments in the nature of compensation to (or for the benefit of) such individual

which are contingent on such change equals or exceeds an amount equal to 3 times the base amount."

26 U.S.C. § 280G(b)(2); *see also* Mertens, *supra,* at § 25E:33. Essentially, the "base amount" equals the individual's average annualized compensation, which was includable as gross income, for the five years preceding the taxable year in question. 26 U.S.C. § 280G(b)(3).[3] Any transfer of property (*e.g.,* stock or stock options) is treated as a payment and must be taken into account at its fair market value. 26 U.S.C. §§ 280G(d)(3)(A), (d)(3)(B). Completing this statutory scheme, section 280G(c) defines a "disqualified individual" as an employee who performs personal services for any corporation and who is "an officer, shareholder, or highly-compensated individual" of the corporation.

A second provision in the 1984 Act, new section 4999 of the Code, imposes an excise tax of twenty percent on recipients of excess parachute payments. Subsection (a) of this provision states that "[t]here is hereby imposed on any person who receives an excess parachute payment a tax equal to 20 percent of the amount of such payment." 26 U.S.C. § 4999(a) (2000). For purposes of this subsection, the term "excess parachute payment" has the same meaning given to it by section 280G. *Id.* at § 4999(b); *see also* Mertens, *supra,* at § 25E:33. Taken together, under sections 280G and 4999(a), once the aggregate present value of the payments contingent on the requisite change exceeds the three-times base amount threshold of section 280G(b)(2)(A)(ii), the excise tax is imposed not on that excess, but on the amount by which the parachute payments exceed the base amount. *See Cline,* 34 F.3d at 482 n. 1; 1 Boris I. Bittker & Lawrence Lokken, Federal Tax'n of Income, Estates and Gifts ¶ 64.5.10 (2005) (hereinafter "Bittker & Lokken").[4]

---

3. The parachute rules do not apply to a payment that a taxpayer establishes by "clear and convincing evidence" to be "reasonable compensation" for personal services rendered. 26 U.S.C. § 280G(b)(4). Plaintiffs do not assert that this exception applies to the payments in question.

4. To illustrate these provisions, assume that during the five taxable years 1990 through 1994, an executive/disqualified individual had an average taxable compensation from his corporation equal to $500,000. In 1995, there is a change in control, and the executive receives a $4 million parachute payment. Since the payment *exceeds* $1.5 million, *i.e.,* three times the $500,000 base

In the case *sub judice*, the IRS treated payments that Dr. Yocum received under his restrictive stock agreement as being "an excess parachute payment," subject to the excise tax imposed by section 4999. There is no question that Dr. Yocum is a "disqualified" individual within the meaning of section 280G(c), nor that if the payment he received was a "parachute payment," that such payment would be an excess payment subject to the excise tax imposed by section 4999. At issue, though, is whether the payment Dr. Yocum received was "contingent on a change ... in the ownership of a substantial portion of the assets of the corporation." The court thus must determine whether the formation of the joint venture and the transferring of assets from MPI to Equistar, which admittedly triggered the payment in question, represented the sort of change in ownership envisioned by section 280G(c) and, in turn, section 4999.

The Conference Report accompanying the 1984 Act explained that "a payment is to be treated as contingent on a change of ownership or control under the provision if such payment would not in fact have been made to the disqualified individual had no change in ownership or control occurred." H.R. Conf. Rep. 98–861, at 851 (1984), U.S.Code Cong. & Admin.News 1984, pp. 1445, 1539. To illustrate the "contingent on a change in ownership or control" concept, the Conference Report offered the following example—

> Assume that a contract provides for the acceleration of vesting or a payment of any deferred incentive compensation, for the acceleration of the time for the exercise of stock options, or for payments in cancellation of stock options, contingent on a change in control. Payments resulting from such a contract are treated as contingent on a change in control.

*Id.* But, neither section 280G nor section 4999 defines when a "change in ownership" occurs. The legislative history of these provisions merely states that "[w]hether a particular transaction involves a change in the ownership or effective control of a corporation or in ownership of a substantial portion of its assets is to be determined under all the facts and circumstances." H.R. Conf. Rep. No. 98–861, *supra,* at 851; *see also Szomjassy v. OHM Corp.,* 132 F.Supp.2d 1041, 1053 (N.D.Ga.2001); *Balch v. Comm'r,* 100 T.C. 331, 344, 1993 WL 106707 (1993), *aff'd,* 34 F.3d 480 (7th Cir.1994).

In 1989, the Commissioner issued proposed regulations under section 280G using a question and answer (Q/A) format. *See* Golden Parachute Payments, § 1.280G–1, Proposed Income Tax Regs., 54 Fed.Reg. 19390 (proposed May 5, 1989) (as corrected by 54 Fed.Reg. 25879 (June 20, 1989) and 54 Fed.Reg. 29061 (July 11, 1989)) (hereinafter "1989 proposed regulations"). A–29 of these regulations defined a "change in the ownership of a substantial portion of a corporation's assets" in the following terms:

> [A] change in the ownership of a substantial portion of a corporation's assets occurs on the date that any one person, or more than one person acting as a group, acquires ... during the 12–month period ... assets from the corporation that have a total fair market value equal to or more than one third of the total fair market value of all of the assets of the corporation immediately prior to such acquisition or acquisitions.

1989 proposed regulations, A–29(a), 54 Fed. Reg. at 19403; *see also* Mertens, *supra,* at § 25E:34. The proposed regulations set out four exceptions to the above rule, two of which involve overlapping shareholders, *i.e.,* those that have interests in both the transferring and receiving entities, and are potentially relevant here. Thus, paragraph (b)(3) of A–29 provided that no change in ownership would occur if the assets were transferred to "a person, or more than one person acting as a group, that owns, directly or indirectly, 50 percent or more of the total value or voting power of all the outstanding stock of the corporation." 1989 proposed regulation, A–29(b)(3), 54 Fed.Reg. at 19403. Piggybacking on the (b)(3) exception, paragraph (b)(4) of A–29 provided that no owner-

---

amount, it qualifies as a parachute payment. The excess parachute payment is $3.5 million ($4 million less the $500,000 base amount). The executive thus must pay a section 4999 excise tax of $700,000, and the corporation loses any deduction for the $3.5 million.

ship would occur if the assets were transferred to "[a]n entity, at least 50 percent of the total value or voting power is owned, directly or indirectly, by a person described in paragraph (b)(3)." *Id.*

The phrase "acting as a group" was not defined in Q/A–29. That phrase, however, was defined in A–27 of the 1989 proposed regulations, which stated—

> **For purposes of paragraph (a) of this A–27**, persons will not be considered to be "acting as a group" merely because they happen to purchase or own stock of the same corporation at the same time, or as a result of the same public offering. However, persons will be considered to be "acting as a group" if they are owners of an entity that enters into a merger, consolidation, purchase or acquisition of stock, or similar business transaction with the corporation.

1989 proposed regulations, A–27, 54 Fed. Reg. at 45764 (emphasis added). Under the highlighted precatory language, this definition of "acting as a group" did not apply explicitly to a change of ownership under Q/A 29. This led some practitioners to assert that, under Q/A–29, when institutional shareholders owned stock both in the target company and the acquiring company, their indirect ownership of stock in the resulting or combined entity, through the acquiring company, resulted in no "change in control" taking place for the target company.[5]

The 1989 proposed regulations were never finally promulgated, and on February 20, 2002, gave way to new proposed regulations on golden parachute payments. Golden Parachute Payments, § 1.280G, 67 Fed.Reg. 7630 (proposed Feb. 20, 2002). On August 4, 2003, the IRS issued final regulations, clarifying the rules regarding when a transfer of assets would result in an excess parachute payment, with particular focus on the overlapping shareholders exceptions to those rules. Golden Parachute Payments, Treas. Reg. § 1.280G, 68 Fed.Reg. 45745, 45765 (Aug. 4, 2003). Section 1.280G–1, A–29(b)(1) of the regulations provides that there is no change in ownership or control under A–29(a) when there is a transfer to an entity that is controlled by the shareholders of the transferring corporation immediately after the transfer. Regarding when the shareholders of the transferring corporation would be deemed to have control over the transferee, these final regulations adopted a provision in the 2002 proposed regulations which defined "acting as a group" in the following terms.

> (c) For purposes of this A–29, . . . . [i]f a person, including an entity shareholder, owns stock in both corporations that enter into a merger, consolidation, purchase or acquisition of stock, or similar transaction, such shareholder is considered to be acting as a group with other shareholders in a corporation only to the extent of the ownership in that corporation prior to the transaction giving rise to the change and not with respect to the ownership interest in the other corporation.

26 C.F.R. § 1.280G–1, A–29(c) (2003). Under this provision, a shareholder is considered to be acting as a group with other shareholders in an entity only to the extent of its ownership in the entity prior to the transaction.[6]

Generally, the final regulations "apply to any payment that is contingent on a change

---

**5.** *See, e.g.,* Mary B. Hevener, Golden Parachutes: New Exemptions for Some People and Some Deals But Bigger "Excess Parachutes," 96 J. Tax'n 261, 270 (2002); Bruce A. Wolk, *The Golden Parachute Provisions: Time for Repeal?*, 21 Va. Tax Rev. 125, 176–178 (2001) (hereinafter "Wolk").

**6.** To illustrate, assume corporations Alpha and Beta create a joint venture AlphaBeta, in which Alpha has a 52 percent interest and Beta has 48 percent interest. Assume that as part of the joint venture, Beta transfers a significant portion of it property to AlphaBeta. Finally, assume that shareholder Kappa, a shareholder of Beta, also owns 5 percent of Alpha shares. If the overlapping share ownership is ignored, the transfer would be viewed as made to a person, AlphaBeta, whose shareholders did not have a 50 percent or more interest in Beta, resulting in a change of ownership that would trigger section 280G. The new regulation ensures that such will be the case. This result is comparable to that under IRS' consolidated return regulations, under which shareholdings are limited to shares that are held in each of the two corporations premerger. *See* 26 C.F.R. § 1.1502–75(d)(3) (2003); *see also* Wolk, *supra*, at 179 n. 188.

in ownership or control if the change in ownership or control occurs on or after January 1, 2004." 68 Fed.Reg. at 45745.[7] In the preamble to these regulations, however, the IRS posited that the so-called "overlapping shareholder rule" in A–29(c) of the final regulations was "consistent with the interpretation of the 1989 proposed regulations by the IRS." *Id.* at 45749. It asserted that the new language was a "clarification," not a "modification," of the proposed 1989 regulations, and thus not subject to the general transitional rule under the regulations quoted above. *Id.* at 45750. The IRS concluded that although "[t]axpayers are permitted to rely on the 1989 proposed regulations" for changes before January 1, 2004, taxpayers could not rely on the 1989 regulations for a proposition that contradicted with the regulations on the overlapping shareholder rule. *Id.*

### B. Did Dr. Yocum Receive an Excess Parachute Payment?

Plaintiffs make two basic arguments here: First, they rely on the legislative history of the parachute provisions in contending that the formation of Equistar was not the sort of acquisition of assets to which Congress intended the golden parachute provisions to apply. Second, they assert that the formation of Equistar did not constitute a change in the ownership of a substantial portion of Millennium's assets under the 1989 proposed regulations—specifically, that the transaction was excepted from the change of ownership rules under paragraph (b)(4) of A–29, owing to the overlapping shareholders' interest in Lyondell. The court will consider plaintiffs' arguments—and defendant's retorts thereto—*seriatim.*

#### 1. Plaintiffs' Reliance on the Legislative History of the Excess Parachute Payment Provisions.

■ Plaintiffs asseverate that the legislative history of the 1994 Act limits the sweep of the parachute provisions to the specific concerns identified in that legislative history. They claim that that history reflects that the provisions should apply only to acquisitions

by an unrelated party, where the parachute payment creates a conflict between the interests of the shareholders and the subject executive and reduces the amount paid to those shareholders. Such is not the case here, they assert, requiring this court to conclude that transfer of assets to Equistar did not trigger the excess parachute provisions of section 280G and 4999 of the Code. But, to paraphrase Justice Frankfurter, while plaintiffs' "syllogism is perfect," their argument "is a bit of verbal logic from which the meaning of things has evaporated." *Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 191, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). In short, as will be seen, plaintiffs' argument not only unduly elevates the statute's legislative history over its language, but also proceeds from a myopic and mistaken view of that history.

"The legislative intent of Congress is to be derived from the language and structure of the statute itself, if possible." *United States v. Lanier,* 520 U.S. 259, 268 n. 6, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997); *see also Medtronic, Inc. v. Lohr,* 518 U.S. 470, 486, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). As such, "[s]tatutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,* 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985); *see also BedRoc Ltd., LLC v. United States,* 541 U.S. 176, 183, 124 S.Ct. 1587, 158 L.Ed.2d 338 (2004) (this inquiry requires the court to "begin[ ] with the statutory text, and end[ ] there as well if the text is unambiguous."). In this regard, the Supreme Court has instructed that "[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997); *see also Board of Governors of Fed. Reserve Sys. v. Dimension Fin. Corp.,* 474 U.S. 361, 373–74, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986). These principles have been applied by courts construing various

---

7. A later correction clarified that taxpayers could rely on the provisions after August 4, 2003.

Treas. Dec. Int. Rev. 9083, 68 Fed.Reg. 59114 (October 14, 2003).

excise taxes. *See, e.g., American Bankers Ins. Group v. United States,* 408 F.3d 1328, 1332 (11th Cir.2005); *Pittway Corp. v. United States,* 102 F.3d 932, 934–35 (7th Cir. 1996); *America Online, Inc. v. United States,* 64 Fed.Cl. 571, 577 (2005). And they have been invoked by courts construing the very parachute provisions in question. *See, e.g., Cline,* 34 F.3d at 486 ("The language of the statute is the best starting point."); *Powell v. Comm'r,* 100 T.C. 77, 83, 1993 WL 34743 (1993) (employing the "ordinary definition" of the phrase "cancellable at will" as used in section 280G).

By its terms, section 280G applies to any payment contingent on a "change ... in the ownership of a substantial portion of the assets of the corporation." Contrary to plaintiffs' suggestions, while this language undoubtedly includes transfers of properties to wholly unrelated parties, it is in no way limited to such circumstances.[8] Rather, the broad sweep of this language admits no exception for transfers of property from one corporation to another entity, even if both entities have some overlapping ownership. Indeed, whether certain investors own interests in both the transferor and transferee seemingly is of little moment, given the common understanding that the shareholders of a corporation do not own any of the corporate assets,[9] a concept of which Congress must be deemed to have been aware.[10] Moreover, while the statute's language might be stretched not to apply to asset transfers that occur in the context of mere changes in the form of ownership or corporate reorganizations, such is not the case here. Nor is there any hint that the statute applies, as plaintiffs contend, only where the transfer and a resulting parachute payment actually creates a conflict between a highly-compensated executive and a company's shareholders or somehow diminishes the amount of compensation received by those shareholders.

Had Congress wanted to include any of these limitations in the statutory language it could have done so. It did not. In fact, in 1986, when Congress wanted to address an issue involving overlapping shareholders, it did so statutorily by exempting from the purview of section 280G transfers of assets

---

8. *See* The American Heritage Dictionary of the English Language 310 (4th ed.2000) ("change" is "[t]he act, process, or result of altering or modifying;" "[t]he replacing of one thing for another; substitution; ... *a change of ownership*"); *Id.* at 1258 ("ownership" is "[t]he state or fact of being an owner; [l]egal right to the possession of a thing.").

9. As recently stated by the Supreme Court:
   A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities.... An individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets and, as a result, does not own subsidiary corporations in which the corporation holds an interest. See 1 Fletcher Cyclopedia of the Law of Private Corporations § 31 (rev. ed.1999). A corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary; and, it follows with even greater force, the parent does not own or have legal title to the subsidiaries of the subsidiary. *See id.,* § 31, at 514 ("The properties of two corporations are distinct, though the same shareholders own or control both. A holding corporation does not own the subsidiary's property").
   *Dole Food Co. v. Patrickson,* 538 U.S. 468, 474–75, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003); *see also, e.g., Society for Savings in the City of Cleveland v. Bowers,* 349 U.S. 143, 147, 75 S.Ct. 607, 99 L.Ed. 950 (1955) ("stockholders' interests in a corporation represent a separate property interest from the corporation's ownership of its assets"); *Rhode Island Hosp. Trust Co. v. Doughton,* 270 U.S. 69, 81, 46 S.Ct. 256, 70 L.Ed. 475 (1926) ("[t]he owner of the shares of stock in a company is not the owner of the corporations' property"); *Smith v. Washington Sheraton Corp.,* 135 F.3d 779, 786 (D.C.Cir.1998) (quoting the *Rhode Island* opinion above); *Engel v. Teleprompter Corp.,* 703 F.2d 127, 131 (5th Cir.1983) ("A purchase of stock in a corporation ... does not constitute the purchase of the corporate assets, just as a transfer of the stock of a corporation is not a transfer of the property and assets of the corporation itself."); *Matter of Beck Indus., Inc.,* 479 F.2d 410, 415 (2d Cir.1973), *cert. denied,* 414 U.S. 858, 94 S.Ct. 163, 38 L.Ed.2d 108 (1973) ("Ownership of all of the outstanding stock of a corporation ... is not the equivalent of ownership of the subsidiary's property or assets").

10. *See, e.g., Field v. Mans,* 516 U.S. 59, 69, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) ("where Congress uses terms that have accumulated settled meaning under ... the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms."); *Flores. v. United States,* 51 Fed.Cl. 49, 53 (2001) (same).

among members of an "affiliated group." *See* Tax Reform Act of 1986, Pub.L. No. 99–514, § 1804(j)(4) (1986) (codified, as amended, at 26 U.S.C. § 280G(d)(5) (2000)). Thus, as amended, section 280G(d)(5) of the Code provides that "all members of the same affiliated group ... shall be treated as 1 corporation for purposes of this section," thereby precluding the shifting of assets from one subsidiary to another from being treated as a "change in ownership." 26 U.S.C. § 280G(d)(5). This section defines the term "affiliated group" by reference to section 1504 of the Code, which, in turn, generally defines affiliation as involving 80 percent ownership of both the voting power and value of another corporation's stock. *Id.*[11] Given the 80 percent threshold, this provision obviously offers plaintiffs no solace here. Indeed, plaintiffs mount no textual argument whatsoever—not even a tortured one—explaining how the limitations they urge somehow are lurking within the statutory language actually enacted by Congress. Their silence in this regard speaks volumes.

The language of the statute is too strong to bend as plaintiffs wish. Contrary to plaintiffs' importunings, there is no reason to construe the statute so as to give its language less than its ordinary meaning. That penal statutes are to be construed narrowly gives plaintiffs no quarter here. As the Supreme Court long ago said in *Ash Sheep Co. v. United States*, 252 U.S. 159, 170, 40 S.Ct. 241, 64 L.Ed. 507 (1920):

The admitted rule that penal statutes are to be strictly construed, is not violated by allowing their words to have full meaning, or even the more extended of two meanings, where such construction best harmonizes with the context, and most fully promotes the policy and objects of the Legislature.

*See also Osaka Shosen Kaisha Line v. United States*, 300 U.S. 98, 101, 57 S.Ct. 356, 81 L.Ed. 532 (1937); *United States v. Bettenhausen*, 499 F.2d 1223, 1234 (10th Cir.1974).[12] Indeed, the 1984 Act can as easily be viewed as remedial legislation, promoting the public welfare, and, as such, not subject to the narrow construction rule. *See Johnson v. Southern Pac. Co.*, 196 U.S. 1, 17, 25 S.Ct. 158, 49 L.Ed. 363 (1904); *United States v. Chicago, M. & P.S. Ry. Co.*, 197 F. 624, 627 (E.D.Wash.1912) ("While the statute is penal in its nature, it is in some aspects remedial and should be so construed as to promote the apparent policy and object of the Legislature, and not entirely defeat its purpose."). At all events, the welter of construction canons aside, the objective here must be to effectuate, rather than defeat, the obvious intent of the Congress. And, in the case *sub judice,* the court need do nothing to the words of the relevant statutes, but to accept them—a course that requires the court to reject the heavy gloss plaintiffs would place upon the parachute provisions.

That said, in many ways, plaintiffs' argument is much ballyhoo about nothing because the legislative history of the 1984 Act does

---

11. Specifically, section 280G indicated that the term "affiliated group" shall be "as defined in section 1504, determined without regard to section 1504(b)." 26 U.S.C. § 280G(d)(5). Section 1504 defines the phrase "affiliated group" for purposes of the consolidated return provisions of the Code. 26 U.S.C. §§ 1501–1563 (2000). Section 1504(b) excludes certain types of corporations from being included within such affiliated groups, such as foreign or tax-exempt corporations. 26 U.S.C. § 1504(b).

12. As early as 1820, Chief Justice Marshall wrote—

The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself.... It is said, that notwithstanding this rule, the intention of the lawmaker must govern in the construction of penal, as well as other statutes. This is true. But this is not a new independent rule, which

subverts the old. It is a modification of the ancient maxim, and amounts to this, that though penal laws are to be construed strictly, they are not to be construed so strictly as to defeat the obvious intention of the legislature. The maxim is not to be so applied as to narrow the words of the statute to the exclusion of cases, which those words, in their ordinary acceptation, or in that sense in which the legislature has obviously used them, would comprehend.

*United States v. Wiltberger*, 18 U.S. (5 Wheaton) 76, 95, 5 L.Ed. 37 (1820); *see also* 3 Norman J. Singer, Sutherland Statutory Construction § 59:3 (6th ed. 2001) ("The rule of lenity should only be applied if after reviewing all sources of legislative intent the statute still remains ambiguous ... A statute must be read with common sense, even in light of the rule of lenity.").

not purport to limit the purposes of the parachute provisions in the fashion plaintiffs claim. While the legislative history undoubtedly reflects concern over the use of golden parachutes to ward off hostile takeovers, there is no indication that this was Congress' exclusive focus. To the contrary, the legislative history reveals that Congress more broadly was concerned that golden parachutes triggered by changes in control, whether friendly or not, "provide corporate funds to subsidize officers or other highly compensated individuals." Senate Print, *supra*, at 195. This concern, in fact, was translated into two key components of the statute—the first triggers nondeductibility and the excise tax if an amount paid exceeds a threshold based on an executive's historical compensation and the second offers a safe harbor if the executive can show, by clear and convincing evidence, that the payment represented reasonable compensation. Other reports indicate that Congress was disturbed that parachute payment agreements hindered "acquisition activity in the marketplace" by making target corporations less attractive to prospective suitors and "encourage[d] the executives and other key personnel involved to favor a proposed takeover that might not be in the best interests of the shareholders *or others*." Staff of Joint Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, 98th Cong., 2d Sess. 199 (J. Comm. Print 1984).[13] The legislative history thus does not support the notion that the parachute provisions apply only to hostile transactions or somehow are limited to instances in which specific abuses are actually documented. *See also* H. Rep. No. 100–391(II),at 1495 (1987), U.S.Code Cong. & Admin.News 1987, pp. 2313-1, 2313-1086 ("The purpose of the golden parachute provisions is to protect equity shareholders whose interest in the corporation could be impaired by parachute payments to disqualified individuals"); S. Rep. 100–445, at 4904–05 (1988), U.S.Code Cong. & Admin.News 1988, pp. 4515, 4904-05 (same).

Prompted by the statute's broad language and its legislative history, courts have interpreted section 280G broadly, refusing to limit it to certain forms of parachute agreements or changes of control. *See, e.g., Cline,* 34 F.3d at 481, 486–87 (discussing the legislative history and holding that the provisions apply to both formal and informal agreements); *Hemingway v. United States,* 81 F.Supp.2d 1163, 1165 (D.Utah 1999) (noting that "the statute is written broadly" in concluding that it applies to agreements between an executive and the acquiring company); *Square D. Co.,* 121 T.C. at 208 (citing legislative history and rejecting construction that would trigger statute based on payments made on post-control-change agreements only where such agreements were legally required by a pre-control-change agreement); *Balch,* 100 T.C. at 344–49 (reviewing the legislative history and concluding that the statute applies to oral agreements). In each of these cases, the taxpayer urged narrowing constructions of section 280G and, in every instance, the court demurred. Indeed, no case has re-

---

**13.** In *Cline,* 34 F.3d at 481–82 (citations omitted), the Seventh Circuit provided a succinct summary of this legislative history, stating:

The golden parachute provisions ... were added to the Internal Revenue Code by the Deficit Reduction Act of 1984 in order to discourage the use of golden parachutes—payments to senior executives of a company in the event of a corporate takeover. Congress found that agreement to make such payments hindered "acquisition activity in the marketplace" by making target corporations less attractive to prospective investors. The prospect of a handsome payment tends to encourage management personnel of the target corporation to favor a proposed takeover, regardless of whether the takeover would be in the best interest of the target corporation's shareholders.

*See also Square D. Corp.,* 121 T.C. at 214 (the statute addresses "[t]he deleterious effect ... of golden parachute contracts on the acquisition process for publicly traded corporations"); Bittker & Lokken, *supra,* at ¶ 64:5.1 ("whether a takeover is hostile or friendly, golden parachute payments tend to divert to management employees amounts that would otherwise be paid to shareholders for their stock"); Miske, *supra,* at 1678–79 ("Sections 280G and 4999 were enacted because Congress believed that corporate decision making in takeover situations should not be critically influenced by executives' concern for their own personal benefit. Takeover situations create an inherent conflict of interest because management may be disinclined to complete a merger or acquisition that may put their job at risk, even though the merger or acquisition would be beneficial to their shareholders.").

motely construed the parachute provisions in the cramped fashion plaintiffs urge. Nor is there the slightest hint in the decisional law of the sorts of considerations that plaintiffs would have be the sockdolager here.

Even were the legislative history otherwise, this court would not be authorized to depart from the statute's broad language. *See, e.g., United States v. Alcan Aluminum, Inc.,* 25 F.3d 1174, 1180 (3d Cir.1994); *Wagner v. Office of Personnel Management,* 783 F.2d 1042, 1045 (Fed.Cir.1986), *cert. denied,* 477 U.S. 906, 106 S.Ct. 3276, 91 L.Ed.2d 566 (1986). As noted by the Federal Circuit in rejecting a similar type of claim, "[s]uch a conclusion would require at a minimum a clear, unequivocal, and explicit statement by Congress that it so intended." *Wagner,* 783 F.2d at 1045. Indeed, courts should be particularly loathe to limit a generally worded statute based on specific examples given in legislative history. Of course, in reality, the legislative history implies no such limitations, but, to the contrary, is consonant with the conclusion that section 280G covers the transaction in question.

### 2. Plaintiffs' Reliance on the 1989 Proposed Regulations.

Unable to find persuasive support for their position in the text, general purpose, or specific history of the Tax Reform Act of 1984, plaintiffs are left to rely upon the 1989 proposed regulations. They assert that these regulations hold that "if a corporation transfers assets to an entity, of which at least 50% of the value or voting power is directly or indirectly held by persons who also own at least 50% of the transferring corporation, then the transfer of such assets will not

trigger the golden parachute provisions." They contend that, in applying the so-called "overlapping shareholder" rule of A–29, the court should combine the direct interest Millennium's shareholders held in Equistar with the indirect interest the so-called overlapping shareholders held in Equistar via their 18.2 percent interest in Lyondell. Under this theory, the Millennium shareholders ended up with more than a 50 percent interest in Equistar—they possessed a 43 percent interest directly in Equistar and a 10 percent interest indirectly by virtue of their ownership in Lyondell, with the latter figure derived by multiplying Lyondell's 57 percent interest in Equistar by the shareholders 18.2 percent interest in Lyondell.

■ Plaintiffs, however, seem to proceed from a faulty notion of the binding quality of the 1989 proposed regulations. Contrary to their view, in general, proposed regulations have no legal force or effect until they become final.[14] Importantly, this is a two-way street—the IRS may no more claim deference to such regulations as a taxpayer may directly invoke such regulations against the IRS.[15] Rather, as the term "proposed" denotes, such regulations are "merely preliminary proposals" that are subject to comment by interested parties and which may be "reconsider[ed] ... in the light of pertinent statutes and its adverse effects upon the revenue." *Garvey,* 1 Cl.Ct. at 118; *see also Sweet v. Sheahan,* 235 F.3d 80, 87 (2d Cir. 2000); *LeCroy,* 751 F.2d at 127 ("Proposed regulations are suggestions made for comment; they modify nothing"). Nor are these principles different simply because the IRS allows a proposed regulation to linger, unadopted, over a long period of time.[16]

---

14. *See, e.g., Tedori v. United States,* 211 F.3d 488, 492 (9th Cir.2000); *Matter of Appletree Markets, Inc.,* 19 F.3d 969, 973 (5th Cir.1994); *Oakley v. City of Longmont,* 890 F.2d 1128, 1130 (10th Cir.1989), *cert. denied,* 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990); *LeCroy Research Systems Corp. v. United States,* 751 F.2d 123, 127 (2d Cir.1984); *Zinniel v. Comm'r,* 89 T.C. 357, 369, 1987 WL 43894 (1987), *aff'd,* 883 F.2d 1350 (7th Cir.1989); *see also* 1 Mertens at § 3:38.

15. *See, e.g., Southland Royalty Co. v. United States,* 22 Cl.Ct. 525, 529 n. 13 (1991); *Garvey, Inc. v. United States,* 1 Cl.Ct. 108, 118 (1983), *aff'd,* 726 F.2d 1569 (Fed.Cir.1984); *Blackfeet*

*Nat'l Bank v. Rubin,* 890 F.Supp. 48, 52–54 (D.D.C.1995) ("[P]roposed regulations do not purport to regulate current conduct by the parties ... [and] do not have the status of law or require anyone to comply with them in any matter."), *aff'd,* 67 F.3d 972 (D.C.Cir.1995); *Estate of Leavitt v. Comm'r,* 1988 WL 8227, at * 18 (Tax Ct.1988), *aff'd,* 875 F.2d 420 (4th Cir.1989) ("Proposed regulations are only preliminary proposals; they are not binding on respondent or on the Court.").

16. When the IRS wishes to institute a binding regulation immediately, it may promulgate a temporary regulation with the proposed regula-

Plaintiffs, however, claim that the circumstances here are different—that the IRS indicated that taxpayers could rely upon the provisions of the 1989 proposed regulations. *Per contra.* To be sure, in adopting the final regulations under section 280G, the Commissioner generally indicated that taxpayers could rely upon the 1989 proposed regulations with respect to a change in ownership or control that occurred prior to January 1, 2004. *See* Preamble to § 1.280G–1, 68 Fed. Reg. 45745 (Aug. 4, 2003); *see also* Preamble to § 1.280G–1, Proposed income Tax Regs., 67 Fed.Reg. 7630 (Feb. 20, 2002). But, in the preamble to these regulations, the IRS indicated, as to the so-called "overlapping shareholder rule" in A–29(c), that—

> these regulations are effective with respect to changes in ownership or control that occur after January 1, 2004, and to payments that are contingent on such changes. These regulations do not provide any transitional rules for the application of the overlapping shareholder rules for prior periods both because these regulations are not effective for prior periods and because the positions set forth in 2002 proposed regulations are merely clarifications of the positions taken by the IRS under section 280G (illustrated by the 1989 proposed regulations).

68 Fed.Reg. at 45750. Reemphasizing this point, the preamble to the final regulations stated that although "[t]axpayers are permitted to rely on the 1989 proposed regulations" for changes before January 1, 2004, taxpayers could not rely on the 1989 regulations for a proposition that contradicted with the 2002/2003 regulations if the IRS had deemed the new regulations as only a "clarification." *Id.* at 54750 ("A clarification in the 2002 proposed regulations does not support reliance on the 1989 proposed regulations for a position contrary to the provisions of the 1989 proposed regulations."). Accordingly, it is apparent that plaintiffs cannot seek to enforce the 1989 regulations in a fashion that is inconsistent with the final regulations.

At all events, it does not appear that the 1989 proposed regulations, if properly construed, support plaintiffs' position. Recall

tion. *See* 26 U.S.C. § 7805(e) (2000). Obvious-

that under these regulations a change in the ownership of a substantial portion of the assets of a corporation occurs when "any one person, or more than one person acting as a group," acquires assets from a corporation that have a total fair market value equal to or more than one third of the total fair market value of all of the assets of the corporation immediately prior to such acquisition. Plaintiffs claim that they are covered by the (b)(4) exception to this rule that provides that a transfer of assets by a corporation is not treated as a change in the ownership of such assets if the assets are transferred to "[a]n entity, at least 50 percent of the total value or voting power is owned, directly or indirectly, by a person described in paragraph (b)(3) of" A–29 in the proposed regulations. Paragraph (b)(3) refers to a "[p]erson, or more than one person acting as a group, that owns, directly or indirectly, 50 percent or more of the total value or voting power of all the outstanding stock of the corporation." As is true of the Code generally, for purposes of this provision, a person includes "an individual, a trust, estate, partnership, association, company or corporation." 26 U.S.C. § 7701(a)(1) (2000).

Plaintiffs assert that more than 50 percent of the value of Equistar was "owned, directly or indirectly, by a person described in paragraph (b)(3)," that is, a "person, or more than one person acting as a group, that owns, directly or indirectly, 50 percent or more of the total value or voting power of all the outstanding stock of the corporation." It claims that those persons were the shareholders of Millennium, which assertedly owned a 43 percent interest in Equistar through their Millennium shares and 10 percent interest in Equistar through the overlapping shareholders ownership of Lyondell shares. However, there are several problems with this construction.

First, it should be noted that the (b)(4) exception does not refer to "more than one person acting as a group," but rather only to "a person described in paragraph (b)(3)." Nothing in the latter language suggests that the indirect ownership required to meet the requirements of the (b)(4) exception could be

ly, it did not do so here.

accomplished by combining the interests of more than one person. Nonetheless, assuming *arguendo* the ownership requirement of the (b)(4) exception may be met by more than one person, those persons must be "acting as a group." The latter phrase hardly describes a group of institutional investors that, by all accounts, did not interact with each other, let alone with Millennium, in possessing the supposed indirect investment in Equistar. Rather, in accordance with its plain meaning, the phrase "acting as a group" seemingly connotes some concerted or coordinated action. *See, e.g., GAF Corp. v. Milstein*, 453 F.2d 709, 716–17 (2d Cir. 1971), *cert. denied*, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972) (construing this concept in the context of § 3(d), Securities and Exchange Act of 1934 (codified at 15 U.S.C. § 78m(d))). Had the IRS intended the (b)(4) exception to refer to any combination of persons, including those related only by their coincidental interests in the subject corporation, it simply could have referred to a "person, or more than one person." It did not. Indeed, any notion that the phrase "acting as a group" adds nothing of substance to the proposed regulation is belied by the definition of that phrase in A–27 of the 1989 proposed regulations. While that definition, by its terms, did not apply to A–29, it presence certainly testifies that the phrase "acting as a group" was not superfluous.

To construe the 1989 proposed regulations in the fashion plaintiffs claim is to suggest that prior to the issuance of the final regulations, executives and companies easily could sidestep the parachute provisions, at least

where widely-held corporations were involved—allowing taxpayers to accomplish via asset transfers what they could not have accomplished in a merger, given Q/A 27 of the proposed regulations. All that would have been needed to effectuate this elusion was some level of overlapping shareholders between the two companies—hardly unusual in an age of large institutional investors, such as mutual funds or large state employee pension funds. Even if such overlapping shareholders owned an extremely small percentage of the acquiring entity, a shift of corporate assets could be designed so that the acquiring entity actually obtained control over those assets, even though when taking into account the common shareholders, no change in ownership would be deemed to occur under the parachute provisions.[17] Rejecting the artificiality of such an approach, one commentator has observed—

It is highly doubtful that Congress intended this result. The evil that Congress sought to remedy, namely using corporate funds to enrich entrenched management, is just as present when two comparably sized publicly held corporations merge as when a large corporation absorbs a much smaller one. The fact that there is overlapping institutional ownership would seem irrelevant.

Wolk, *supra*, at 178. In light of these considerations, not to mention the plain language of the statute and its legislative history, this court declines plaintiffs invitation to strain the language of the 1989 proposed regulations.[18] While "[l]ogic and taxation are not

17. For example, say that the nine institutional investors involved here did not own 18.2 percent of the Lyondell, but rather only 1 percent thereof. Under plaintiffs' interpretation of the 1989 regulations, a joint venture agreement could still have afforded Lyondell a 50.1 percent interest in Equistar, without triggering the parachute provisions. In plaintiff's view, section 280G would be applied in this instance by adding to Millennium's 49.9 percent interest in Equistar the indirect impact of the 1 percent interest of the overlapping shareholders in Lyondell. The latter, according to plaintiffs' theory, would translate into a 0.501 percent interest in Equistar (1 percent of Lyondell's 50.1 percent interest in Equistar), which when added to Millennium's 49.9 percent interest would mean that there would be no shift in the ownership of a substantial portion

of Millennium's property under the general standard established by the 1989 proposed regulations. Under this scenario, Lyondell would acquire control over Equistar, but not be deemed to have done so for purposes of section 280G. Such a planning feature could rely on even infinitesimal holdings by an overlapping shareholder and easily could have been incorporated into a wide range of transactions.

18. Plaintiffs briefly assert that the transaction in question would not constitute a change in control under the final regulations under section 280G, claiming that the overlapping shareholders would be deemed to be "acting as a group" under A–29. But, there is no indication that the definition of "acting as a group" is any broader under the final regulations than under the 1989

always the best of friends," *Sonneborn Bros. v. Cureton,* 262 U.S. 506, 522, 43 S.Ct. 643, 67 L.Ed. 1095 (1923) (McReynolds, J., concurring), it appears that here they are, at least, close acquaintances.

### III. CONCLUSION

This court need go no further. Based on the foregoing, it concludes that the payments received by Dr. Yocum were "excess parachute payments" subject to the excise tax imposed by section 4999 of the Code. Accordingly, the court **DENIES** plaintiffs' motion for summary judgment and **GRANTS** defendant's cross-motion for summary judgment. The Clerk shall dismiss plaintiffs' complaint.

**IT IS SO ORDERED.**

proposed regulations. Indeed, as noted above, the final regulations plainly limit the scope of who may be deemed "acting as a group," to preclude the type of indirect ownership that plaintiffs claim here. *See* 26 C.F.R. § 1.280G–1, A–29(b)(1)(iv).